# UNITED STATES *v.* LEON ET AL.

No. 82–1771.   Argued January 17, 1984—Decided July 5, 1984

898

WHITE, J., delivered the opinion of the Court, in which BURGER, C. J., and BLACKMUN, POWELL, REHNQUIST, and O'CONNOR, JJ., joined. BLACKMUN, J., filed a concurring opinion, *post*, p. 927. BRENNAN, J., filed a dissenting opinion, in which MARSHALL, J., joined, *post*, p. 928. STEVENS, J., filed a dissenting opinion, *post*, p. 960.

*Solicitor General Lee* argued the cause for the United States. With him on the briefs were *Assistant Attorney General Trott, Deputy Solicitor General Frey, Kathryn A. Oberly,* and *Robert J. Erickson.*

*Barry Tarlow* argued the cause for respondent Leon. With him on the brief were *Norman Kaplan* and *Thomas V. Johnston. Roger L. Cossack* argued the cause for respondents Stewart et al. With him on the brief was *Jay L. Lichtman.**

---

*Briefs of *amici curiae* urging reversal were filed for the State of California by *John K. Van De Kamp,* Attorney General, *William D. Stein,* Chief Assistant Attorney General, and *Clifford K. Thompson, Jr.,* Deputy Attorney General; for the State of Kansas et al. by *Wilkes C. Robinson, Dan M. Peterson, Robert T. Stephan,* Attorney General of Kansas, *John D. Ashcroft,* Attorney General of Missouri, *Mark V. Meierhenry,* Attorney General of South Dakota, and *Bronson C. La Follette,* Attorney General of Wisconsin; for the Criminal Justice Legal Foundation by *Christopher*

JUSTICE WHITE delivered the opinion of the Court.

This case presents the question whether the Fourth Amendment exclusionary rule should be modified so as not to bar the use in the prosecution's case in chief of evidence obtained by officers acting in reasonable reliance on a search warrant issued by a detached and neutral magistrate but ultimately found to be unsupported by probable cause. To resolve this question, we must consider once again the tension between the sometimes competing goals of, on the one hand, deterring official misconduct and removing inducements to unreasonable invasions of privacy and, on the other, establishing procedures under which criminal defendants are "ac-

N. Heard; for the National District Attorneys Association, Inc., by Newman A. Flanagan, Austin J. McGuigan, John M. Massameno, Edwin L. Miller, Jr., Jack E. Yelverton, and James P. Manak; and for Seven Former Members of the Attorney General's Task Force on Violent Crime et al. by David L. Crump, Frank G. Carrington, Griffin B. Bell, Wayne W. Schmidt, James P. Manak, Fred E. Inbau, Rufus L. Edmisten, Attorney General of North Carolina, and David S. Crump, Deputy Attorney General.

Briefs of amici curiae urging affirmance were filed for the Bar Association of San Francisco et al. by James J. Brosnahan; for the Arkansas Trial Lawyers Association et al. by John Wesley Hall, Jr.; for the Association of Trial Lawyers of America by Sidney Bernstein; and for the Texas Criminal Defense Lawyers Association et al. by Gerald H. Goldstein and Marvin Miller.

Briefs of amici curiae were filed for the Committee on Criminal Law of the Association of the Bar of the City of New York by Peter L. Zimroth and Barbara D. Underwood; for the Illinois State Bar Association by Michael J. Costello, Albert Hofeld, William J. Martin, and Joshua Sachs; for the Minnesota State Bar Association by Ronald L. Seeger, Steven H. Goldberg, and Bruce H. Hanley; for the National Association of Criminal Defense Lawyers et al. by Marshall W. Krause, Steffan B. Imhoff, and Charles Scott Spear; for the National Association for the Advancement of Colored People et al. by Steven P. Lockman, John M. Campbell, and Thomas I. Atkins; for the National Legal Aid and Defender Association by Kenneth M. Mogill; and for Dan Johnston, County Attorney, Polk County, Iowa, by Mr. Johnston, pro se.

quitted or convicted on the basis of all the evidence which exposes the truth." *Alderman* v. *United States*, 394 U. S. 165, 175 (1969).

I

In August 1981, a confidential informant of unproven reliability informed an officer of the Burbank Police Department that two persons known to him as "Armando" and "Patsy" were selling large quantities of cocaine and methaqualone from their residence at 620 Price Drive in Burbank, Cal. The informant also indicated that he had witnessed a sale of methaqualone by "Patsy" at the residence approximately five months earlier and had observed at that time a shoebox containing a large amount of cash that belonged to "Patsy." He further declared that "Armando" and "Patsy" generally kept only small quantities of drugs at their residence and stored the remainder at another location in Burbank.

On the basis of this information, the Burbank police initiated an extensive investigation focusing first on the Price Drive residence and later on two other residences as well. Cars parked at the Price Drive residence were determined to belong to respondents Armando Sanchez, who had previously been arrested for possession of marihuana, and Patsy Stewart, who had no criminal record. During the course of the investigation, officers observed an automobile belonging to respondent Ricardo Del Castillo, who had previously been arrested for possession of 50 pounds of marihuana, arrive at the Price Drive residence. The driver of that car entered the house, exited shortly thereafter carrying a small paper sack, and drove away. A check of Del Castillo's probation records led the officers to respondent Alberto Leon, whose telephone number Del Castillo had listed as his employer's. Leon had been arrested in 1980 on drug charges, and a companion had informed the police at that time that Leon was heavily involved in the importation of drugs into this country. Before the current investigation began, the Burbank officers had

learned that an informant had told a Glendale police officer that Leon stored a large quantity of methaqualone at his residence in Glendale. During the course of this investigation, the Burbank officers learned that Leon was living at 716 South Sunset Canyon in Burbank.

Subsequently, the officers observed several persons, at least one of whom had prior drug involvement, arriving at the Price Drive residence and leaving with small packages; observed a variety of other material activity at the two residences as well as at a condominium at 7902 Via Magdalena; and witnessed a variety of relevant activity involving respondents' automobiles. The officers also observed respondents Sanchez and Stewart board separate flights for Miami. The pair later returned to Los Angeles together, consented to a search of their luggage that revealed only a small amount of marihuana, and left the airport. Based on these and other observations summarized in the affidavit, App. 34, Officer Cyril Rombach of the Burbank Police Department, an experienced and well-trained narcotics investigator, prepared an application for a warrant to search 620 Price Drive, 716 South Sunset Canyon, 7902 Via Magdalena, and automobiles registered to each of the respondents for an extensive list of items believed to be related to respondents' drug-trafficking activities. Officer Rombach's extensive application was reviewed by several Deputy District Attorneys.

A facially valid search warrant was issued in September 1981 by a State Superior Court Judge. The ensuing searches produced large quantities of drugs at the Via Magdalena and Sunset Canyon addresses and a small quantity at the Price Drive residence. Other evidence was discovered at each of the residences and in Stewart's and Del Castillo's automobiles. Respondents were indicted by a grand jury in the District Court for the Central District of California and charged with conspiracy to possess and distribute cocaine and a variety of substantive counts.

The respondents then filed motions to suppress the evidence seized pursuant to the warrant.[1] The District Court held an evidentiary hearing and, while recognizing that the case was a close one, see *id.*, at 131, granted the motions to suppress in part. It concluded that the affidavit was insufficient to establish probable cause,[2] but did not suppress all of the evidence as to all of the respondents because none of the respondents had standing to challenge all of the searches.[3] In

---

[1] Respondent Leon moved to suppress the evidence found on his person at the time of his arrest and the evidence seized from his residence at 716 South Sunset Canyon. Respondent Stewart's motion covered the fruits of searches of her residence at 620 Price Drive and the condominium at 7902 Via Magdalena and statements she made during the search of her residence. Respondent Sanchez sought to suppress the evidence discovered during the search of his residence at 620 Price Drive and statements he made shortly thereafter. He also joined Stewart's motion to suppress evidence seized from the condominium. Respondent Del Castillo apparently sought to suppress all of the evidence seized in the searches. App. 78–80. The respondents also moved to suppress evidence seized in the searches of their automobiles.

[2] "I just cannot find this warrant sufficient for a showing of probable cause.

.        .        .        .        .

"There is no question of the reliability and credibility of the informant as not being established.

"Some details given tended to corroborate, maybe, the reliability of [the informant's] information about the previous transaction, but if it is not a stale transaction, it comes awfully close to it; and all the other material I think is as consistent with innocence as it is with guilt.

.        .        .        .        .

"So I just do not think this affidavit can withstand the test. I find, then, that there is no probable cause in this case for the issuance of the search warrant . . . ." *Id.*, at 127.

[3] The District Court concluded that Sanchez and Stewart had standing to challenge the search of 620 Price Drive; that Leon had standing to contest the legality of the search of 716 South Sunset Canyon; that none of the respondents had established a legitimate expectation of privacy in the condominium at 7902 Via Magdalena; and that Stewart and Del Castillo each had standing to challenge the searches of their automobiles. The

response to a request from the Government, the court made clear that Officer Rombach had acted in good faith, but it rejected the Government's suggestion that the Fourth Amendment exclusionary rule should not apply where evidence is seized in reasonable, good-faith reliance on a search warrant.[4]

The District Court denied the Government's motion for reconsideration, id., at 147, and a divided panel of the Court of Appeals for the Ninth Circuit affirmed, judgt. order reported at 701 F. 2d 187 (1983). The Court of Appeals first concluded that Officer Rombach's affidavit could not establish probable cause to search the Price Drive residence. To the extent that the affidavit set forth facts demonstrating the basis of the informant's knowledge of criminal activity, the information included was fatally stale. The affidavit, moreover, failed to establish the informant's credibility. Accordingly, the Court of Appeals concluded that the information provided by the informant was inadequate under both prongs of the two-part test established in *Aguilar* v. *Texas*, 378 U. S. 108 (1964), and *Spinelli* v. *United States*, 393 U. S. 410 (1969).[5] The officers' independent investigation neither cured the staleness nor corroborated the details of the informant's declarations. The Court of Appeals then considered whether the affidavit formed a proper basis for the

Government indicated that it did not intend to introduce evidence seized from the other respondents' vehicles. *Id.*, at 127–129. Finally, the court suppressed statements given by Sanchez and Stewart. *Id.*, at 129–130.

[4] "On the issue of good faith, obviously that is not the law of the Circuit, and I am not going to apply that law.

"I will say certainly in my view, there is not any question about good faith. [Officer Rombach] went to a Superior Court judge and got a warrant; obviously laid a meticulous trail. Had surveilled for a long period of time, and I believe his testimony—and I think he said he consulted with three Deputy District Attorneys before proceeding himself, and I certainly have no doubt about the fact that that is true." *Id.*, at 140.

[5] In *Illinois* v. *Gates*, 462 U. S. 213 (1983), decided last Term, the Court abandoned the two-pronged *Aguilar-Spinelli* test for determining whether an informant's tip suffices to establish probable cause for the issuance of a warrant and substituted in its place a "totality of the circumstances" approach.

search of the Sunset Canyon residence. In its view, the affidavit included no facts indicating the basis for the informants' statements concerning respondent Leon's criminal activities and was devoid of information establishing the informants' reliability. Because these deficiencies had not been cured by the police investigation, the District Court properly suppressed the fruits of the search. The Court of Appeals refused the Government's invitation to recognize a good-faith exception to the Fourth Amendment exclusionary rule. App. to Pet. for Cert. 4a.

The Government's petition for certiorari expressly declined to seek review of the lower courts' determinations that the search warrant was unsupported by probable cause and presented only the question "[w]hether the Fourth Amendment exclusionary rule should be modified so as not to bar the admission of evidence seized in reasonable, good-faith reliance on a search warrant that is subsequently held to be defective." We granted certiorari to consider the propriety of such a modification. 463 U. S. 1206 (1983). Although it undoubtedly is within our power to consider the question whether probable cause existed under the "totality of the circumstances" test announced last Term in *Illinois* v. *Gates*, 462 U. S. 213 (1983), that question has not been briefed or argued; and it is also within our authority, which we choose to exercise, to take the case as it comes to us, accepting the Court of Appeals' conclusion that probable cause was lacking under the prevailing legal standards. See this Court's Rule 21.1(a).

We have concluded that, in the Fourth Amendment context, the exclusionary rule can be modified somewhat without jeopardizing its ability to perform its intended functions. Accordingly, we reverse the judgment of the Court of Appeals.

## II

Language in opinions of this Court and of individual Justices has sometimes implied that the exclusionary rule is a necessary corollary of the Fourth Amendment, *Mapp* v.

*Ohio*, 367 U. S. 643, 651, 655–657 (1961); *Olmstead* v. *United States*, 277 U. S. 438, 462–463 (1928), or that the rule is required by the conjunction of the Fourth and Fifth Amendments. *Mapp* v. *Ohio, supra*, at 661–662 (Black, J., concurring); *Agnello* v. *United States*, 269 U. S. 20, 33–34 (1925). These implications need not detain us long. The Fifth Amendment theory has not withstood critical analysis or the test of time, see *Andresen* v. *Maryland*, 427 U. S. 463 (1976), and the Fourth Amendment "has never been interpreted to proscribe the introduction of illegally seized evidence in all proceedings or against all persons." *Stone* v. *Powell*, 428 U. S. 465, 486 (1976).

## A

The Fourth Amendment contains no provision expressly precluding the use of evidence obtained in violation of its commands, and an examination of its origin and purposes makes clear that the use of fruits of a past unlawful search or seizure "work[s] no new Fourth Amendment wrong." *United States* v. *Calandra*, 414 U. S. 338, 354 (1974). The wrong condemned by the Amendment is "fully accomplished" by the unlawful search or seizure itself, *ibid.*, and the exclusionary rule is neither intended nor able to "cure the invasion of the defendant's rights which he has already suffered." *Stone* v. *Powell, supra*, at 540 (WHITE, J., dissenting). The rule thus operates as "a judicially created remedy designed to safeguard Fourth Amendment rights generally through its deterrent effect, rather than a personal constitutional right of the party aggrieved." *United States* v. *Calandra, supra*, at 348.

Whether the exclusionary sanction is appropriately imposed in a particular case, our decisions make clear, is "an issue separate from the question whether the Fourth Amendment rights of the party seeking to invoke the rule were violated by police conduct." *Illinois* v. *Gates, supra*, at 223. Only the former question is currently before us, and it must

be resolved by weighing the costs and benefits of preventing the use in the prosecution's case in chief of inherently trustworthy tangible evidence obtained in reliance on a search warrant issued by a detached and neutral magistrate that ultimately is found to be defective.

The substantial social costs exacted by the exclusionary rule for the vindication of Fourth Amendment rights have long been a source of concern. "Our cases have consistently recognized that unbending application of the exclusionary sanction to enforce ideals of governmental rectitude would impede unacceptably the truth-finding functions of judge and jury." *United States* v. *Payner*, 447 U. S. 727, 734 (1980). An objectionable collateral consequence of this interference with the criminal justice system's truth-finding function is that some guilty defendants may go free or receive reduced sentences as a result of favorable plea bargains.[6] Particu-

---

[6] Researchers have only recently begun to study extensively the effects of the exclusionary rule on the disposition of felony arrests. One study suggests that the rule results in the nonprosecution or nonconviction of between 0.6% and 2.35% of individuals arrested for felonies. Davies, A Hard Look at What We Know (and Still Need to Learn) About the "Costs" of the Exclusionary Rule: The NIJ Study and Other Studies of "Lost" Arrests, 1983 A. B. F. Res. J. 611, 621. The estimates are higher for particular crimes the prosecution of which depends heavily on physical evidence. Thus, the cumulative loss due to nonprosecution or nonconviction of individuals arrested on felony drug charges is probably in the range of 2.8% to 7.1%. *Id.*, at 680. Davies' analysis of California data suggests that screening by police and prosecutors results in the release because of illegal searches or seizures of as many as 1.4% of all felony arrestees, *id.*, at 650, that 0.9% of felony arrestees are released, because of illegal searches or seizures, at the preliminary hearing or after trial, *id.*, at 653, and that roughly 0.05% of all felony arrestees benefit from reversals on appeal because of illegal searches. *Id.*, at 654. See also K. Brosi, A Cross-City Comparison of Felony Case Processing 16, 18–19 (1979); U. S. General Accounting Office, Report of the Comptroller General of the United States, Impact of the Exclusionary Rule on Federal Criminal Prosecutions 10–11, 14 (1979); F. Feeney, F. Dill, & A. Weir, Arrests Without Convictions: How Often They Occur and Why 203–206 (National Institute of Justice

larly when law enforcement officers have acted in objective good faith or their transgressions have been minor, the magnitude of the benefit conferred on such guilty defendants offends basic concepts of the criminal justice system. *Stone* v. *Powell*, 428 U. S., at 490. Indiscriminate application of the exclusionary rule, therefore, may well "generat[e] disrespect for the law and administration of justice." *Id.*, at 491. Accordingly, "[a]s with any remedial device, the application of the rule has been restricted to those areas where its remedial objectives are thought most efficaciously served." *United States* v. *Calandra, supra,* at 348; see *Stone* v. *Powell, supra,* at 486–487; *United States* v. *Janis,* 428 U. S. 433, 447 (1976).

## B

Close attention to those remedial objectives has characterized our recent decisions concerning the scope of the Fourth Amendment exclusionary rule. The Court has, to be sure, not seriously questioned, "in the absence of a more efficacious sanction, the continued application of the rule to suppress ev-

---

1983); National Institute of Justice, The Effects of the Exclusionary Rule: A Study in California 1–2 (1982); Nardulli, The Societal Cost of the Exclusionary Rule: An Empirical Assessment, 1983 A. B. F. Res. J. 585, 600. The exclusionary rule also has been found to affect the plea-bargaining process. S. Schlesinger, Exclusionary Injustice: The Problem of Illegally Obtained Evidence 63 (1977). But see Davies, *supra*, at 668–669; Nardulli, *supra*, at 604–606.

Many of these researchers have concluded that the impact of the exclusionary rule is insubstantial, but the small percentages with which they deal mask a large absolute number of felons who are released because the cases against them were based in part on illegal searches or seizures. "[A]ny rule of evidence that denies the jury access to clearly probative and reliable evidence must bear a heavy burden of justification, and must be carefully limited to the circumstances in which it will pay its way by deterring official unlawlessness." *Illinois* v. *Gates,* 462 U. S., at 257–258 (WHITE, J., concurring in judgment). Because we find that the rule can have no substantial deterrent effect in the sorts of situations under consideration in this case, see *infra,* at 916–921, we conclude that it cannot pay its way in those situations.

idence from the [prosecution's] case where a Fourth Amendment violation has been substantial and deliberate. . . ." *Franks* v. *Delaware*, 438 U. S. 154, 171 (1978); *Stone* v. *Powell, supra,* at 492. Nevertheless, the balancing approach that has evolved in various contexts—including criminal trials—"forcefully suggest[s] that the exclusionary rule be more generally modified to permit the introduction of evidence obtained in the reasonable good-faith belief that a search or seizure was in accord with the Fourth Amendment." *Illinois* v. *Gates,* 462 U. S., at 255 (WHITE, J., concurring in judgment).

In *Stone* v. *Powell, supra,* the Court emphasized the costs of the exclusionary rule, expressed its view that limiting the circumstances under which Fourth Amendment claims could be raised in federal habeas corpus proceedings would not reduce the rule's deterrent effect, *id.,* at 489–495, and held that a state prisoner who has been afforded a full and fair opportunity to litigate a Fourth Amendment claim may not obtain federal habeas relief on the ground that unlawfully obtained evidence had been introduced at his trial. Cf. *Rose* v. *Mitchell,* 443 U. S. 545, 560–563 (1979). Proposed extensions of the exclusionary rule to proceedings other than the criminal trial itself have been evaluated and rejected under the same analytic approach. In *United States* v. *Calandra,* for example, we declined to allow grand jury witnesses to refuse to answer questions based on evidence obtained from an unlawful search or seizure since "[a]ny incremental deterrent effect which might be achieved by extending the rule to grand jury proceedings is uncertain at best." 414 U. S., at 348. Similarly, in *United States* v. *Janis, supra,* we permitted the use in federal civil proceedings of evidence illegally seized by state officials since the likelihood of deterring police misconduct through such an extension of the exclusionary rule was insufficient to outweigh its substantial social costs. In so doing, we declared that, "[i]f . . . the exclusionary rule does not result in appreciable deterrence, then, clearly, its use in the instant situation is unwarranted." *Id.,* at 454.

As cases considering the use of unlawfully obtained evidence in criminal trials themselves make clear, it does not follow from the emphasis on the exclusionary rule's deterrent value that "anything which deters illegal searches is thereby commanded by the Fourth Amendment." *Alderman* v. *United States*, 394 U. S., at 174. In determining whether persons aggrieved solely by the introduction of damaging evidence unlawfully obtained from their co-conspirators or codefendants could seek suppression, for example, we found that the additional benefits of such an extension of the exclusionary rule would not outweigh its costs. *Id.*, at 174–175. Standing to invoke the rule has thus been limited to cases in which the prosecution seeks to use the fruits of an illegal search or seizure against the victim of police misconduct. *Rakas* v. *Illinois*, 439 U. S. 128 (1978); *Brown* v. *United States*, 411 U. S. 223 (1973); *Wong Sun* v. *United States*, 371 U. S. 471, 491–492 (1963). Cf. *United States* v. *Payner*, 447 U. S. 727 (1980).

Even defendants with standing to challenge the introduction in their criminal trials of unlawfully obtained evidence cannot prevent every conceivable use of such evidence. Evidence obtained in violation of the Fourth Amendment and inadmissible in the prosecution's case in chief may be used to impeach a defendant's direct testimony. *Walder* v. *United States*, 347 U. S. 62 (1954). See also *Oregon* v. *Hass*, 420 U. S. 714 (1975); *Harris* v. *New York*, 401 U. S. 222 (1971). A similar assessment of the "incremental furthering" of the ends of the exclusionary rule led us to conclude in *United States* v. *Havens*, 446 U. S. 620, 627 (1980), that evidence inadmissible in the prosecution's case in chief or otherwise as substantive evidence of guilt may be used to impeach statements made by a defendant in response to "proper cross-examination reasonably suggested by the defendant's direct examination." *Id.*, at 627–628.

When considering the use of evidence obtained in violation of the Fourth Amendment in the prosecution's case in chief, moreover, we have declined to adopt a *per se* or "but for" rule

that would render inadmissible any evidence that came to light through a chain of causation that began with an illegal arrest. *Brown* v. *Illinois*, 422 U. S. 590 (1975); *Wong Sun* v. *United States, supra,* at 487–488. We also have held that a witness' testimony may be admitted even when his identity was discovered in an unconstitutional search. *United States* v. *Ceccolini*, 435 U. S. 268 (1978). The perception underlying these decisions—that the connection between police misconduct and evidence of crime may be sufficiently attenuated to permit the use of that evidence at trial—is a product of considerations relating to the exclusionary rule and the constitutional principles it is designed to protect. *Dunaway* v. *New York*, 442 U. S. 200, 217–218 (1979); *United States* v. *Ceccolini, supra,* at 279.[7] In short, the "dissipation of the taint" concept that the Court has applied in deciding whether exclusion is appropriate in a particular case "attempts to mark the point at which the detrimental consequences of illegal police action become so attenuated that the deterrent effect of the exclusionary rule no longer justifies its cost." *Brown* v. *Illinois, supra,* at 609 (POWELL, J., concurring in part). Not surprisingly in view of this purpose, an assessment of the flagrancy of the police misconduct constitutes an important step in the calculus. *Dunaway* v. *New York, supra,* at 218; *Brown* v. *Illinois, supra,* at 603–604.

The same attention to the purposes underlying the exclusionary rule also has characterized decisions not involving the scope of the rule itself. We have not required suppression of the fruits of a search incident to an arrest made in good-faith reliance on a substantive criminal statute that subsequently

---

[7] *"Brown's* focus on 'the causal connection between the illegality and the confession' reflected the two policies behind the use of the exclusionary rule to effectuate the Fourth Amendment. Where there is a close causal connection between the illegal seizure and the confession, not only is exclusion of the evidence more likely to deter similar police misconduct in the future, but use of the evidence is more likely to compromise the integrity of the courts." *Dunaway* v. *New York*, 442 U. S., at 217–218 (citation omitted).

is declared unconstitutional. *Michigan* v. *DeFillippo*, 443 U. S. 31 (1979).[8] Similarly, although the Court has been unwilling to conclude that new Fourth Amendment principles are always to have only prospective effect, *United States* v. *Johnson*, 457 U. S. 537, 560 (1982),[9] no Fourth Amendment decision marking a "clear break with the past" has been applied retroactively. See *United States* v. *Peltier*, 422 U. S. 531 (1975); *Desist* v. *United States*, 394 U. S. 244 (1969); *Linkletter* v. *Walker*, 381 U. S. 618 (1965).[10] The propriety

---

[8] We have held, however, that the exclusionary rule requires suppression of evidence obtained in searches carried out pursuant to statutes, not yet declared unconstitutional, purporting to authorize searches and seizures without probable cause or search warrants. See, *e. g.*, *Ybarra* v. *Illinois*, 444 U. S. 85 (1979); *Torres* v. *Puerto Rico*, 442 U. S. 465 (1979); *Almeida-Sanchez* v. *United States*, 413 U. S. 266 (1973); *Sibron* v. *New York*, 392 U. S. 40 (1968); *Berger* v. *New York*, 388 U. S. 41 (1967). "Those decisions involved statutes which, by their own terms, authorized searches under circumstances which did not satisfy the traditional warrant and probable-cause requirements of the Fourth Amendment." *Michigan* v. *DeFillippo*, 443 U. S., at 39. The substantive Fourth Amendment principles announced in those cases are fully consistent with our holding here.

[9] The Court held in *United States* v. *Johnson,* that a construction of the Fourth Amendment that did not constitute a "clear break with the past" is to be applied to all convictions not yet final when the decision was handed down. The limited holding, see 457 U. S., at 562, turned in part on the Court's judgment that "[f]ailure to accord *any* retroactive effect to Fourth Amendment rulings would 'encourage police or other courts to disregard the plain purport of our decisions and to adopt a let's-wait-until-it's-decided approach.'" *Id.*, at 561 (emphasis in original) (quoting *Desist* v. *United States*, 394 U. S. 244, 277 (1969) (Fortas, J., dissenting)). Contrary to respondents' assertions, nothing in *Johnson* precludes adoption of a good-faith exception tailored to situations in which the police have reasonably relied on a warrant issued by a detached and neutral magistrate but later found to be defective.

[10] Our retroactivity decisions have, for the most part, turned on our assessments of "(a) the purpose to be served by the new standards, (b) the extent of the reliance by law enforcement authorities on the old standards, and (c) the effect on the administration of justice of a retroactive application of the new standards." *Stovall* v. *Denno*, 388 U. S. 293, 297 (1967). As we observed earlier this Term:

of retroactive application of a newly announced Fourth Amendment principle, moreover, has been assessed largely in terms of the contribution retroactivity might make to the deterrence of police misconduct. *United States* v. *Johnson, supra,* at 560–561; *United States* v. *Peltier, supra,* at 536–539, 542.

As yet, we have not recognized any form of good-faith exception to the Fourth Amendment exclusionary rule.[11] But the balancing approach that has evolved during the years of experience with the rule provides strong support for the modification currently urged upon us. As we discuss below, our evaluation of the costs and benefits of suppressing reliable physical evidence seized by officers reasonably relying on a warrant issued by a detached and neutral magistrate leads to the conclusion that such evidence should be admissible in the prosecution's case in chief.

## III

### A

Because a search warrant "provides the detached scrutiny of a neutral magistrate, which is a more reliable safeguard

---

"In considering the reliance factor, this Court's cases have looked primarily to whether law enforcement authorities and state courts have justifiably relied on a prior rule of law said to be different from that announced by the decision whose retroactivity is at issue. Unjustified 'reliance' is no bar to retroactivity. This inquiry is often phrased in terms of whether the new decision was foreshadowed by earlier cases or was a 'clear break with the past.'" *Solem* v. *Stumes,* 465 U. S. 638, 645–646 (1984).

[11] Members of the Court have, however, urged reconsideration of the scope of the exclusionary rule. See, *e. g., Stone* v. *Powell,* 428 U. S. 465, 496 (1976) (BURGER, C. J., concurring); *id.,* at 536 (WHITE, J., dissenting); *Illinois* v. *Gates,* 462 U. S., at 254–267 (WHITE, J., concurring in judgment); *Brown* v. *Illinois,* 422 U. S. 590, 609–612 (1975) (POWELL, J., concurring in part); *Schneckloth* v. *Bustamonte,* 412 U. S. 218, 261–271 (1973) (POWELL, J., concurring); *California* v. *Minjares,* 443 U. S. 916 (1979) (REHNQUIST, J., dissenting from denial of stay). One Court of Appeals, no doubt influenced by these individual urgings, has adopted a form of good-faith exception to the exclusionary rule. *United States* v. *Williams,* 622 F. 2d 830 (CA5 1980) (en banc), cert. denied, 449 U. S. 1127 (1981).

914

against improper searches than the hurried judgment of a law enforcement officer 'engaged in the often competitive enterprise of ferreting out crime,'" *United States* v. *Chadwick,* 433 U. S. 1, 9 (1977) (quoting *Johnson* v. *United States,* 333 U. S. 10, 14 (1948)), we have expressed a strong preference for warrants and declared that "in a doubtful or marginal case a search under a warrant may be sustainable where without one it would fall." *United States* v. *Ventresca,* 380 U. S. 102, 106 (1965). See *Aguilar* v. *Texas,* 378 U. S., at 111. Reasonable minds frequently may differ on the question whether a particular affidavit establishes probable cause, and we have thus concluded that the preference for warrants is most appropriately effectuated by according "great deference" to a magistrate's determination. *Spinelli* v. *United States,* 393 U. S., at 419. See *Illinois* v. *Gates,* 462 U. S., at 236; *United States* v. *Ventresca, supra,* at 108–109.

Deference to the magistrate, however, is not boundless. It is clear, first, that the deference accorded to a magistrate's finding of probable cause does not preclude inquiry into the knowing or reckless falsity of the affidavit on which that determination was based. *Franks* v. *Delaware,* 438 U. S. 154 (1978).[12]  Second, the courts must also insist that the magistrate purport to "perform his 'neutral and detached' function and not serve merely as a rubber stamp for the police." *Aguilar* v. *Texas, supra,* at 111. See *Illinois* v. *Gates, supra,* at 239.  A magistrate failing to "manifest that neutrality and detachment demanded of a judicial officer when presented with a warrant application" and who acts instead as "an adjunct law enforcement officer" cannot provide valid authorization for an otherwise unconstitutional search. *Lo-Ji Sales, Inc.* v. *New York,* 442 U. S. 319, 326–327 (1979).

---

[12] Indeed, "it would be an unthinkable imposition upon [the magistrate's] authority if a warrant affidavit, revealed after the fact to contain a deliberately or recklessly false statement, were to stand beyond impeachment." 438 U. S., at 165.

Third, reviewing courts will not defer to a warrant based on an affidavit that does not "provide the magistrate with a substantial basis for determining the existence of probable cause." *Illinois* v. *Gates*, 462 U. S., at 239. "Sufficient information must be presented to the magistrate to allow that official to determine probable cause; his action cannot be a mere ratification of the bare conclusions of others." *Ibid.* See *Aguilar* v. *Texas, supra,* at 114–115; *Giordenello* v. *United States*, 357 U. S. 480 (1958); *Nathanson* v. *United States*, 290 U. S. 41 (1933).[13]  Even if the warrant application was supported by more than a "bare bones" affidavit, a reviewing court may properly conclude that, notwithstanding the deference that magistrates deserve, the warrant was invalid because the magistrate's probable-cause determination reflected an improper analysis of the totality of the circumstances, *Illinois* v. *Gates, supra,* at 238–239, or because the form of the warrant was improper in some respect.

Only in the first of these three situations, however, has the Court set forth a rationale for suppressing evidence obtained pursuant to a search warrant; in the other areas, it has simply excluded such evidence without considering whether

---

[13] See also *Beck* v. *Ohio*, 379 U. S. 89 (1964), in which the Court concluded that "the record . . . does not contain a single objective fact to support a belief by the officers that the petitioner was engaged in criminal activity at the time they arrested him." *Id.*, at 95.  Although the Court was willing to assume that the arresting officers acted in good faith, it concluded:

" '[G]ood faith on the part of the arresting officers is not enough.' *Henry* v. *United States*, 361 U. S. 98, 102.  If subjective good faith alone were the test, the protections of the Fourth Amendment would evaporate, and the people would be 'secure in their persons, houses, papers, and effects,' only in the discretion of the police." *Id.*, at 97.

We adhere to this view and emphasize that nothing in this opinion is intended to suggest a lowering of the probable-cause standard.  On the contrary, we deal here only with the remedy to be applied to a concededly unconstitutional search.

916

Fourth Amendment interests will be advanced. To the extent that proponents of exclusion rely on its behavioral effects on judges and magistrates in these areas, their reliance is misplaced. First, the exclusionary rule is designed to deter police misconduct rather than to punish the errors of judges and magistrates. Second, there exists no evidence suggesting that judges and magistrates are inclined to ignore or subvert the Fourth Amendment or that lawlessness among these actors requires application of the extreme sanction of exclusion.[14]

Third, and most important, we discern no basis, and are offered none, for believing that exclusion of evidence seized pursuant to a warrant will have a significant deterrent effect on the issuing judge or magistrate.[15] Many of the factors

---

[14] Although there are assertions that some magistrates become rubber stamps for the police and others may be unable effectively to screen police conduct, see, e. g., 2 W. LaFave, Search and Seizure § 4.1 (1978); Kamisar, Does (Did) (Should) The Exclusionary Rule Rest on a "Principled Basis" Rather than an "Empirical Proposition"?, 16 Creighton L. Rev. 565, 569–571 (1983); Schroeder, Deterring Fourth Amendment Violations: Alternatives to the Exclusionary Rule, 69 Geo. L. J. 1361, 1412 (1981), we are not convinced that this is a problem of major proportions. See L. Tiffany, D. McIntyre, & D. Rotenberg, Detection of Crime 119 (1967); Israel, Criminal Procedure, the Burger Court, and the Legacy of the Warren Court, 75 Mich. L. Rev. 1319, 1414, n. 396 (1977); P. Johnson, New Approaches to Enforcing the Fourth Amendment 8–10 (Working Paper, Sept. 1978), quoted in Y. Kamisar, W. LaFave, & J. Israel, Modern Criminal Procedure 229–230 (5th ed. 1980); R. Van Duizend, L. Sutton, & C. Carter, The Search Warrant Process, ch. 7 (Review Draft, National Center for State Courts, 1983).

[15] As the Supreme Judicial Court of Massachusetts recognized in *Commonwealth* v. *Sheppard*, 387 Mass. 488, 506, 441 N. E. 2d 725, 735 (1982):

"The exclusionary rule may not be well tailored to deterring judicial misconduct. If applied to judicial misconduct, the rule would be just as costly as it is when it is applied to police misconduct, but it may be ill-fitted to the job-created motivations of judges. . . . [I]deally a judge is impartial as to whether a particular piece of evidence is admitted or a particular defendant convicted. Hence, in the abstract, suppression of a particular piece of evidence may not be as effective a disincentive to a neutral judge as it would be to the police. It may be that a ruling by an appellate court that a

that indicate that the exclusionary rule cannot provide an effective "special" or "general" deterrent for individual offending law enforcement officers [16] apply as well to judges or magistrates. And, to the extent that the rule is thought to operate as a "systemic" deterrent on a wider audience,[17] it clearly can have no such effect on individuals empowered to issue search warrants. Judges and magistrates are not adjuncts to the law enforcement team; as neutral judicial officers, they have no stake in the outcome of particular criminal prosecutions. The threat of exclusion thus cannot be expected significantly to deter them. Imposition of the exclusionary sanction is not necessary meaningfully to inform judicial officers of their errors, and we cannot conclude that admitting evidence obtained pursuant to a warrant while at the same time declaring that the warrant was somehow defective will in any way reduce judicial officers' professional incentives to comply with the Fourth Amendment, encourage them to repeat their mistakes, or lead to the granting of all colorable warrant requests.[18]

---

search warrant was unconstitutional would be sufficient to deter similar conduct in the future by magistrates."
But see *United States* v. *Karathanos*, 531 F. 2d 26, 33–34 (CA2), cert. denied, 428 U. S. 910 (1976).

[16] See, *e. g.*, *Stone* v. *Powell*, 428 U. S., at 498 (BURGER, C. J., concurring); Oaks, Studying the Exclusionary Rule in Search and Seizure, 37 U. Chi. L. Rev. 665, 709–710 (1970).

[17] See, *e. g.*, *Dunaway* v. *New York*, 442 U. S. 220, 221 (1979) (STEVENS, J., concurring); Mertens & Wasserstrom, The Good Faith Exception to the Exclusionary Rule: Deregulating the Police and Derailing the Law, 70 Geo. L. J. 365, 399–401 (1981).

[18] Limiting the application of the exclusionary sanction may well increase the care with which magistrates scrutinize warrant applications. We doubt that magistrates are more desirous of avoiding the exclusion of evidence obtained pursuant to warrants they have issued than of avoiding invasions of privacy.

Federal magistrates, moreover, are subject to the direct supervision of district courts. They may be removed for "incompetency, misconduct, neglect of duty, or physical or mental disability." 28 U. S. C. § 631(i). If a magistrate serves merely as a "rubber stamp" for the police or is

## B

If exclusion of evidence obtained pursuant to a subsequently invalidated warrant is to have any deterrent effect, therefore, it must alter the behavior of individual law enforcement officers or the policies of their departments. One could argue that applying the exclusionary rule in cases where the police failed to demonstrate probable cause in the warrant application deters future inadequate presentations or "magistrate shopping" and thus promotes the ends of the Fourth Amendment. Suppressing evidence obtained pursuant to a technically defective warrant supported by probable cause also might encourage officers to scrutinize more closely the form of the warrant and to point out suspected judicial errors. We find such arguments speculative and conclude that suppression of evidence obtained pursuant to a warrant should be ordered only on a case-by-case basis and only in those unusual cases in which exclusion will further the purposes of the exclusionary rule.[19]

We have frequently questioned whether the exclusionary rule can have any deterrent effect when the offending officers acted in the objectively reasonable belief that their conduct did not violate the Fourth Amendment. "No empirical researcher, proponent or opponent of the rule, has yet been able to establish with any assurance whether the rule has a deterrent effect . . . ." *United States* v. *Janis*, 428 U. S., at 452, n. 22. But even assuming that the rule effectively

---

unable to exercise mature judgment, closer supervision or removal provides a more effective remedy than the exclusionary rule.

[19] Our discussion of the deterrent effect of excluding evidence obtained in reasonable reliance on a subsequently invalidated warrant assumes, of course, that the officers properly executed the warrant and searched only those places and for those objects that it was reasonable to believe were covered by the warrant. Cf. *Massachusetts* v. *Sheppard, post,* at 989, n. 6 ("[I]t was not unreasonable for the police in this case to rely on the judge's assurances that the warrant authorized the search they had requested").

deters some police misconduct and provides incentives for the law enforcement profession as a whole to conduct itself in accord with the Fourth Amendment, it cannot be expected, and should not be applied, to deter objectively reasonable law enforcement activity.

As we observed in *Michigan* v. *Tucker*, 417 U. S. 433, 447 (1974), and reiterated in *United States* v. *Peltier*, 422 U. S., at 539:

> "The deterrent purpose of the exclusionary rule necessarily assumes that the police have engaged in willful, or at the very least negligent, conduct which has deprived the defendant of some right. By refusing to admit evidence gained as a result of such conduct, the courts hope to instill in those particular investigating officers, or in their future counterparts, a greater degree of care toward the rights of an accused. Where the official action was pursued in complete good faith, however, the deterrence rationale loses much of its force."

The *Peltier* Court continued, *id.*, at 542:

> "If the purpose of the exclusionary rule is to deter unlawful police conduct, then evidence obtained from a search should be suppressed only if it can be said that the law enforcement officer had knowledge, or may properly be charged with knowledge, that the search was unconstitutional under the Fourth Amendment."

See also *Illinois* v. *Gates*, 462 U. S., at 260–261 (WHITE, J., concurring in judgment); *United States* v. *Janis*, *supra*, at 459; *Brown* v. *Illinois*, 422 U. S., at 610–611 (POWELL, J., concurring in part).[20] In short, where the officer's conduct is objectively reasonable,

---

[20] We emphasize that the standard of reasonableness we adopt is an objective one. Many objections to a good-faith exception assume that the exception will turn on the subjective good faith of individual officers. "Grounding the modification in objective reasonableness, however, retains

"excluding the evidence will not further the ends of the exclusionary rule in any appreciable way; for it is painfully apparent that . . . the officer is acting as a reasonable officer would and should act in similar circumstances. Excluding the evidence can in no way affect his future conduct unless it is to make him less willing to do his duty." *Stone* v. *Powell*, 428 U. S., at 539–540 (WHITE, J., dissenting).

This is particularly true, we believe, when an officer acting with objective good faith has obtained a search warrant from a judge or magistrate and acted within its scope.[21]   In most

---

the value of the exclusionary rule as an incentive for the law enforcement profession as a whole to conduct themselves in accord with the Fourth Amendment." *Illinois* v. *Gates*, 462 U. S., at 261, n. 15 (WHITE, J., concurring in judgment); see *Dunaway* v. *New York*, 442 U. S., at 221 (STEVENS, J., concurring). The objective standard we adopt, moreover, requires officers to have a reasonable knowledge of what the law prohibits. *United States* v. *Peltier*, 422 U. S. 531, 542 (1975). As Professor Jerold Israel has observed:

"The key to the [exclusionary] rule's effectiveness as a deterrent lies, I believe, in the impetus it has provided to police training programs that make officers aware of the limits imposed by the fourth amendment and emphasize the need to operate within those limits. [An objective good-faith exception] is not likely to result in the elimination of such programs, which are now viewed as an important aspect of police professionalism. Neither is it likely to alter the tenor of those programs; the possibility that illegally obtained evidence may be admitted in borderline cases is unlikely to encourage police instructors to pay less attention to fourth amendment limitations. Finally, [it] should not encourage officers to pay less attention to what they are taught, as the requirement that the officer act in 'good faith' is inconsistent with closing one's mind to the possibility of illegality." Israel, *supra* n. 14, at 1412–1413 (footnotes omitted).

[21] According to the Attorney General's Task Force on Violent Crime, Final Report (1981), the situation in which an officer relies on a duly authorized warrant

"is a particularly compelling example of good faith. A warrant is a judicial mandate to an officer to conduct a search or make an arrest, and the officer has a sworn duty to carry out its provisions. Accordingly, we believe that

such cases, there is no police illegality and thus nothing to deter. It is the magistrate's responsibility to determine whether the officer's allegations establish probable cause and, if so, to issue a warrant comporting in form with the requirements of the Fourth Amendment. In the ordinary case, an officer cannot be expected to question the magistrate's probable-cause determination or his judgment that the form of the warrant is technically sufficient. "[O]nce the warrant issues, there is literally nothing more the policeman can do in seeking to comply with the law." *Id.*, at 498 (BURGER, C. J., concurring). Penalizing the officer for the magistrate's error, rather than his own, cannot logically contribute to the deterrence of Fourth Amendment violations.[22]

---

there should be a rule which states that evidence obtained pursuant to and within the scope of a warrant is prima facie the result of good faith on the part of the officer seizing the evidence." *Id.*, at 55.

[22] To the extent that JUSTICE STEVENS' conclusions concerning the integrity of the courts, *post*, at 976–978, rest on a foundation other than his judgment, which we reject, concerning the effects of our decision on the deterrence of police illegality, we find his argument unpersuasive. "Judicial integrity clearly does not mean that the courts must never admit evidence obtained in violation of the Fourth Amendment." *United States* v. *Janis*, 428 U. S. 433, 458, n. 35 (1976). "While courts, of course, must ever be concerned with preserving the integrity of the judicial process, this concern has limited force as a justification for the exclusion of highly probative evidence." *Stone* v. *Powell*, 428 U. S., at 485. Our cases establish that the question whether the use of illegally obtained evidence in judicial proceedings represents judicial participation in a Fourth Amendment violation and offends the integrity of the courts

"is essentially the same as the inquiry into whether exclusion would serve a deterrent purpose. . . . The analysis showing that exclusion in this case has no demonstrated deterrent effect and is unlikely to have any significant such effect shows, by the same reasoning, that the admission of the evidence is unlikely to encourage violations of the Fourth Amendment." *United States* v. *Janis*, *supra*, at 459, n. 35.

Absent unusual circumstances, when a Fourth Amendment violation has occurred because the police have reasonably relied on a warrant issued by a detached and neutral magistrate but ultimately found to be defective, "the

## C

We conclude that the marginal or nonexistent benefits produced by suppressing evidence obtained in objectively reasonable reliance on a subsequently invalidated search warrant cannot justify the substantial costs of exclusion. We do not suggest, however, that exclusion is always inappropriate in cases where an officer has obtained a warrant and abided by its terms. "[S]earches pursuant to a warrant will rarely require any deep inquiry into reasonableness," *Illinois* v. *Gates*, 462 U. S., at 267 (WHITE, J., concurring in judgment), for "a warrant issued by a magistrate normally suffices to establish" that a law enforcement officer has "acted in good faith in conducting the search." *United States* v. *Ross*, 456 U. S. 798, 823, n. 32 (1982). Nevertheless, the officer's reliance on the magistrate's probable-cause determination and on the technical sufficiency of the warrant he issues must be objectively reasonable, cf. *Harlow* v. *Fitzgerald*, 457 U. S. 800, 815–819 (1982),[23] and it is clear that in some circum-

_____

integrity of the courts is not implicated." *Illinois* v. *Gates, supra,* at 259, n. 14 (WHITE, J., concurring in judgment). See *Stone* v. *Powell,* 428 U. S., at 485, n. 23; *id.,* at 540 (WHITE, J., dissenting); *United States* v. *Peltier,* 422 U. S. 531, 536–539 (1975).

[23] In *Harlow,* we eliminated the subjective component of the qualified immunity public officials enjoy in suits seeking damages for alleged deprivations of constitutional rights. The situations are not perfectly analogous, but we also eschew inquiries into the subjective beliefs of law enforcement officers who seize evidence pursuant to a subsequently invalidated warrant. Although we have suggested that, "[o]n occasion, the motive with which the officer conducts an illegal search may have some relevance in determining the propriety of applying the exclusionary rule," *Scott* v. *United States,* 436 U. S. 128, 139, n. 13 (1978), we believe that "sending state and federal courts on an expedition into the minds of police officers would produce a grave and fruitless misallocation of judicial resources." *Massachusetts* v. *Painten,* 389 U. S. 560, 565 (1968) (WHITE, J., dissenting). Accordingly, our good-faith inquiry is confined to the objectively ascertainable question whether a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization. In making this determination, all of the circumstances—

stances the officer[24] will have no reasonable grounds for believing that the warrant was properly issued.

Suppression therefore remains an appropriate remedy if the magistrate or judge in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth. *Franks* v. *Delaware*, 438 U. S. 154 (1978). The exception we recognize today will also not apply in cases where the issuing magistrate wholly abandoned his judicial role in the manner condemned in *Lo-Ji Sales, Inc.* v. *New York*, 442 U. S. 319 (1979); in such circumstances, no reasonably well trained officer should rely on the warrant. Nor would an officer manifest objective good faith in relying on a warrant based on an affidavit "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." *Brown* v. *Illinois*, 422 U. S., at 610–611 (POWELL, J., concurring in part); see *Illinois* v. *Gates*, *supra*, at 263–264 (WHITE, J., concurring in judgment). Finally, depending on the circumstances of the particular case, a warrant may be so facially deficient—*i. e.*, in failing to particularize the place to be searched or the things to be seized—that the executing officers cannot reasonably presume it to be valid. Cf. *Massachusetts* v. *Sheppard*, *post*, at 988–991.

In so limiting the suppression remedy, we leave untouched the probable-cause standard and the various requirements for a valid warrant. Other objections to the modification of

including whether the warrant application had previously been rejected by a different magistrate—may be considered.

[24] References to "officer" throughout this opinion should not be read too narrowly. It is necessary to consider the objective reasonableness, not only of the officers who eventually executed a warrant, but also of the officers who originally obtained it or who provided information material to the probable-cause determination. Nothing in our opinion suggests, for example, that an officer could obtain a warrant on the basis of a "bare bones" affidavit and then rely on colleagues who are ignorant of the circumstances under which the warrant was obtained to conduct the search. See *Whiteley* v. *Warden*, 401 U. S. 560, 568 (1971).

924

the Fourth Amendment exclusionary rule we consider to be insubstantial. The good-faith exception for searches conducted pursuant to warrants is not intended to signal our unwillingness strictly to enforce the requirements of the Fourth Amendment, and we do not believe that it will have this effect. As we have already suggested, the good-faith exception, turning as it does on objective reasonableness, should not be difficult to apply in practice. When officers have acted pursuant to a warrant, the prosecution should ordinarily be able to establish objective good faith without a substantial expenditure of judicial time.

Nor are we persuaded that application of a good-faith exception to searches conducted pursuant to warrants will preclude review of the constitutionality of the search or seizure, deny needed guidance from the courts, or freeze Fourth Amendment law in its present state.[25] There is no need for courts to adopt the inflexible practice of always deciding whether the officers' conduct manifested objective good faith before turning to the question whether the Fourth Amendment has been violated. Defendants seeking suppression of the fruits of allegedly unconstitutional searches or seizures undoubtedly raise live controversies which Art. III empowers federal courts to adjudicate. As cases addressing questions of good-faith immunity under 42 U. S. C. § 1983, compare *O'Connor* v. *Donaldson*, 422 U. S. 563 (1975), with *Procunier* v. *Navarette*, 434 U. S. 555, 566, n. 14 (1978), and cases involving the harmless-error doctrine, compare *Milton* v. *Wainwright*, 407 U. S. 371, 372 (1972), with *Coleman* v. *Alabama*, 399 U. S. 1 (1970), make clear, courts have consid-

---

[25] The argument that defendants will lose their incentive to litigate meritorious Fourth Amendment claims as a result of the good-faith exception we adopt today is unpersuasive. Although the exception might discourage presentation of insubstantial suppression motions, the magnitude of the benefit conferred on defendants by a successful motion makes it unlikely that litigation of colorable claims will be substantially diminished.

erable discretion in conforming their decisionmaking processes to the exigencies of particular cases.

If the resolution of a particular Fourth Amendment question is necessary to guide future action by law enforcement officers and magistrates, nothing will prevent reviewing courts from deciding that question before turning to the good-faith issue.[26] Indeed, it frequently will be difficult to determine whether the officers acted reasonably without resolving the Fourth Amendment issue. Even if the Fourth Amendment question is not one of broad import, reviewing courts could decide in particular cases that magistrates under their supervision need to be informed of their errors and so evaluate the officers' good faith only after finding a violation. In other circumstances, those courts could reject suppression motions posing no important Fourth Amendment questions by turning immediately to a consideration of the officers' good faith. We have no reason to believe that our Fourth Amendment jurisprudence would suffer by allowing reviewing courts to exercise an informed discretion in making this choice.

## IV

When the principles we have enunciated today are applied to the facts of this case, it is apparent that the judgment of the Court of Appeals cannot stand. The Court of Appeals applied the prevailing legal standards to Officer Rombach's warrant application and concluded that the application could not support the magistrate's probable-cause determination. In so doing, the court clearly informed the magistrate that he

---

[26] It has been suggested, in fact, that "the recognition of a 'penumbral zone,' within which an inadvertent mistake would not call for exclusion, . . . will make it less tempting for judges to bend fourth amendment standards to avoid releasing a possibly dangerous criminal because of a minor and unintentional miscalculation by the police." Schroeder, *supra* n. 14, at 1420–1421 (footnote omitted); see Ashdown, Good Faith, the Exclusionary Remedy, and Rule-Oriented Adjudication in the Criminal Process, 24 Wm. & Mary L. Rev. 335, 383–384 (1983).

had erred in issuing the challenged warrant. This aspect of the court's judgment is not under attack in this proceeding.

Having determined that the warrant should not have issued, the Court of Appeals understandably declined to adopt a modification of the Fourth Amendment exclusionary rule that this Court had not previously sanctioned. Although the modification finds strong support in our previous cases, the Court of Appeals' commendable self-restraint is not to be criticized. We have now reexamined the purposes of the exclusionary rule and the propriety of its application in cases where officers have relied on a subsequently invalidated search warrant. Our conclusion is that the rule's purposes will only rarely be served by applying it in such circumstances.

In the absence of an allegation that the magistrate abandoned his detached and neutral role, suppression is appropriate only if the officers were dishonest or reckless in preparing their affidavit or could not have harbored an objectively reasonable belief in the existence of probable cause. Only respondent Leon has contended that no reasonably well trained police officer could have believed that there existed probable cause to search his house; significantly, the other respondents advance no comparable argument. Officer Rombach's application for a warrant clearly was supported by much more than a "bare bones" affidavit. The affidavit related the results of an extensive investigation and, as the opinions of the divided panel of the Court of Appeals make clear, provided evidence sufficient to create disagreement among thoughtful and competent judges as to the existence of probable cause. Under these circumstances, the officers' reliance on the magistrate's determination of probable cause was objectively reasonable, and application of the extreme sanction of exclusion is inappropriate.

Accordingly, the judgment of the Court of Appeals is

*Reversed.*

JUSTICE BLACKMUN, concurring.

The Court today holds that evidence obtained in violation of the Fourth Amendment by officers acting in objectively reasonable reliance on a search warrant issued by a neutral and detached magistrate need not be excluded, as a matter of federal law, from the case in chief of federal and state criminal prosecutions. In so doing, the Court writes another chapter in the volume of Fourth Amendment law opened by *Weeks* v. *United States*, 232 U. S. 383 (1914). I join the Court's opinion in this case and the one in *Massachusetts* v. *Sheppard*, *post*, p. 981, because I believe that the rule announced today advances the legitimate interests of the criminal justice system without sacrificing the individual rights protected by the Fourth Amendment. I write separately, however, to underscore what I regard as the unavoidably provisional nature of today's decisions.

As the Court's opinion in this case makes clear, the Court has narrowed the scope of the exclusionary rule because of an empirical judgment that the rule has little appreciable effect in cases where officers act in objectively reasonable reliance on search warrants. See *ante*, at 918–921. Because I share the view that the exclusionary rule is not a constitutionally compelled corollary of the Fourth Amendment itself, see *ante*, at 905–906, I see no way to avoid making an empirical judgment of this sort, and I am satisfied that the Court has made the correct one on the information before it. Like all courts, we face institutional limitations on our ability to gather information about "legislative facts," and the exclusionary rule itself has exacerbated the shortage of hard data concerning the behavior of police officers in the absence of such a rule. See *United States* v. *Janis*, 428 U. S. 433, 448–453 (1976). Nonetheless, we cannot escape the responsibility to decide the question before us, however imperfect our information may be, and I am prepared to join the Court on the information now at hand.

What must be stressed, however, is that any empirical judgment about the effect of the exclusionary rule in a particular class of cases necessarily is a provisional one. By their very nature, the assumptions on which we proceed today cannot be cast in stone. To the contrary, they now will be tested in the real world of state and federal law enforcement, and this Court will attend to the results. If it should emerge from experience that, contrary to our expectations, the good-faith exception to the exclusionary rule results in a material change in police compliance with the Fourth Amendment, we shall have to reconsider what we have undertaken here. The logic of a decision that rests on untested predictions about police conduct demands no less.

If a single principle may be drawn from this Court's exclusionary rule decisions, from *Weeks* through *Mapp* v. *Ohio*, 367 U. S. 643 (1961), to the decisions handed down today, it is that the scope of the exclusionary rule is subject to change in light of changing judicial understanding about the effects of the rule outside the confines of the courtroom. It is incumbent on the Nation's law enforcement officers, who must continue to observe the Fourth Amendment in the wake of today's decisions, to recognize the double-edged nature of that principle.

JUSTICE BRENNAN, with whom JUSTICE MARSHALL joins, dissenting.*

Ten years ago in *United States* v. *Calandra*, 414 U. S. 338 (1974), I expressed the fear that the Court's decision "may signal that a majority of my colleagues have positioned themselves to reopen the door [to evidence secured by official lawlessness] still further and abandon altogether the exclusionary rule in search-and-seizure cases." *Id.*, at 365 (dissenting opinion). Since then, in case after case, I have witnessed the Court's gradual but determined strangulation

---

*[This opinion applies also to No. 82–963, *Massachusetts* v. *Sheppard*, *post*, p. 981.]

of the rule.[1]   It now appears that the Court's victory over the Fourth Amendment is complete.   That today's decisions represent the *pièce de résistance* of the Court's past efforts cannot be doubted, for today the Court sanctions the use in the prosecution's case in chief of illegally obtained evidence against the individual whose rights have been violated—a result that had previously been thought to be foreclosed.

The Court seeks to justify this result on the ground that the "costs" of adhering to the exclusionary rule in cases like those before us exceed the "benefits."   But the language of deterrence and of cost/benefit analysis, if used indiscriminately, can have a narcotic effect.   It creates an illusion of technical precision and ineluctability.   It suggests that not only constitutional principle but also empirical data support the majority's result.   When the Court's analysis is examined carefully, however, it is clear that we have not been treated to an honest assessment of the merits of the exclusionary rule, but have instead been drawn into a curious world where the "costs" of excluding illegally obtained evidence loom to exaggerated heights and where the "benefits" of such exclusion are made to disappear with a mere wave of the hand.

The majority ignores the fundamental constitutional importance of what is at stake here.   While the machinery of law enforcement and indeed the nature of crime itself have changed dramatically since the Fourth Amendment became part of the Nation's fundamental law in 1791, what the Framers understood then remains true today—that the task of combating crime and convicting the guilty will in every era seem of such critical and pressing concern that we may be lured by the temptations of expediency into forsaking our

---

[1] See, *e. g.*, *United States* v. *Peltier*, 422 U. S. 531, 544 (1975) (BRENNAN, J., dissenting); *United States* v. *Janis*, 428 U. S. 433, 460 (1976) (BRENNAN, J., dissenting); *Stone* v. *Powell*, 428 U. S. 465, 502 (1976) (BRENNAN, J., dissenting); *Michigan* v. *DeFillippo*, 443 U. S. 31, 41 (1979) (BRENNAN, J., dissenting); *United States* v. *Havens*, 446 U. S. 620, 629 (1980) (BRENNAN, J., dissenting).

commitment to protecting individual liberty and privacy. It was for that very reason that the Framers of the Bill of Rights insisted that law enforcement efforts be permanently and unambiguously restricted in order to preserve personal freedoms. In the constitutional scheme they ordained, the sometimes unpopular task of ensuring that the government's enforcement efforts remain within the strict boundaries fixed by the Fourth Amendment was entrusted to the courts. As James Madison predicted in his address to the First Congress on June 8, 1789:

> "If [these rights] are incorporated into the Constitution, independent tribunals of justice will consider themselves in a peculiar manner the guardians of those rights; they will be an impenetrable bulwark against every assumption of power in the Legislative or Executive; they will be naturally led to resist every encroachment upon rights expressly stipulated for in the Constitution by the declaration of rights." 1 Annals of Cong. 439.

If those independent tribunals lose their resolve, however, as the Court has done today, and give way to the seductive call of expediency, the vital guarantees of the Fourth Amendment are reduced to nothing more than a "form of words." *Silverthorne Lumber Co.* v. *United States*, 251 U. S. 385, 392 (1920).

A proper understanding of the broad purposes sought to be served by the Fourth Amendment demonstrates that the principles embodied in the exclusionary rule rest upon a far firmer constitutional foundation than the shifting sands of the Court's deterrence rationale. But even if I were to accept the Court's chosen method of analyzing the question posed by these cases, I would still conclude that the Court's decision cannot be justified.

I

The Court holds that physical evidence seized by police officers reasonably relying upon a warrant issued by a de-

tached and neutral magistrate is admissible in the prosecution's case in chief, even though a reviewing court has subsequently determined either that the warrant was defective, No. 82–963, or that those officers failed to demonstrate when applying for the warrant that there was probable cause to conduct the search, No. 82–1771. I have no doubt that these decisions will prove in time to have been a grave mistake. But, as troubling and important as today's new doctrine may be for the administration of criminal justice in this country, the mode of analysis used to generate that doctrine also requires critical examination, for it may prove in the long run to pose the greater threat to our civil liberties.

## A

At bottom, the Court's decision turns on the proposition that the exclusionary rule is merely a "'judicially created remedy designed to safeguard Fourth Amendment rights generally through its deterrent effect, rather than a personal constitutional right.'" *Ante*, at 906, quoting *United States* v. *Calandra*, 414 U. S., at 348. The germ of that idea is found in *Wolf* v. *Colorado*, 338 U. S. 25 (1949), and although I had thought that such a narrow conception of the rule had been forever put to rest by our decision in *Mapp* v. *Ohio*, 367 U. S. 643 (1961), it has been revived by the present Court and reaches full flower with today's decision. The essence of this view, as expressed initially in the *Calandra* opinion and as reiterated today, is that the sole "purpose of the Fourth Amendment is to prevent unreasonable governmental intrusions into the privacy of one's person, house, papers, or effects. The wrong condemned is the unjustified governmental invasion of these areas of an individual's life. That wrong . . . is *fully accomplished* by the original search without probable cause." 414 U. S., at 354 (emphasis added); see also *ante*, at 906. This reading of the Amendment implies that its proscriptions are directed solely at those government agents who may actually invade an individual's constitution-

ally protected privacy. The courts are not subject to any direct constitutional duty to exclude illegally obtained evidence, because the question of the admissibility of such evidence is not addressed by the Amendment. This view of the scope of the Amendment relegates the judiciary to the periphery. Because the only constitutionally cognizable injury has already been "fully accomplished" by the police by the time a case comes before the courts, the Constitution is not itself violated if the judge decides to admit the tainted evidence. Indeed, the most the judge *can* do is wring his hands and hope that perhaps by excluding such evidence he can deter future transgressions by the police.

Such a reading appears plausible, because, as critics of the exclusionary rule never tire of repeating,[2] the Fourth Amendment makes no express provision for the exclusion of evidence secured in violation of its commands. A short answer to this claim, of course, is that many of the Constitution's most vital imperatives are stated in general terms and the task of giving meaning to these precepts is therefore left to subsequent judicial decisionmaking in the context of concrete cases. The nature of our Constitution, as Chief Justice Marshall long ago explained, "requires that only its great outlines should be marked, its important objects designated, and the minor ingredients which compose those objects be deduced from the nature of the objects themselves." *McCulloch* v. *Maryland,* 4 Wheat. 316, 407 (1819).

A more direct answer may be supplied by recognizing that the Amendment, like other provisions of the Bill of Rights, restrains the power of the government as a whole; it does not specify only a particular agency and exempt all others. The judiciary is responsible, no less than the executive, for ensuring that constitutional rights are respected.

---

[2] See, *e. g.*, Wilkey, The Exclusionary Rule: Why Suppress Valid Evidence?, 62 Judicature 215 (1978); S. Schlesinger, Exclusionary Injustice (1977).

When that fact is kept in mind, the role of the courts and their possible involvement in the concerns of the Fourth Amendment comes into sharper focus. Because seizures are executed principally to secure evidence, and because such evidence generally has utility in our legal system only in the context of a trial supervised by a judge, it is apparent that the admission of illegally obtained evidence implicates the same constitutional concerns as the initial seizure of that evidence. Indeed, by admitting unlawfully seized evidence, the judiciary becomes a part of what is in fact a single governmental action prohibited by the terms of the Amendment.[3] Once that connection between the evidence-gathering role of the police and the evidence-admitting function of the courts is acknowledged, the plausibility of the Court's interpretation becomes more suspect. Certainly nothing in the language or history of the Fourth Amendment suggests that a recognition of this evidentiary link between the police and the courts was meant to be foreclosed.[4] It is difficult to give any meaning

[3] In deciding to enforce the exclusionary rule as a matter of state law, the California Supreme Court clearly recognized this point:

"When, as in the present case, the very purpose of an illegal search and seizure is to get evidence to introduce at a trial, the success of the lawless venture depends entirely on the court's lending its aid by allowing the evidence to be introduced. It is no answer to say that a distinction should be drawn between the government acting as law enforcer and the gatherer of evidence and the government acting as judge." *People* v. *Cahan,* 44 Cal. 2d 434, 445, 282 P. 2d 905, 912 (1955).

For a thoughtful examination of this point, see Schrock & Welsh, Up from Calandra: The Exclusionary Rule as a Constitutional Requirement, 59 Minn. L. Rev. 251, 289–307 (1974).

[4] Examination of the early state declarations of rights which formed the models for the Fourth Amendment reveals that they were aimed as much at explicitly limiting the manner in which government could gather evidence as at protecting individual privacy. For example, the Massachusetts Constitution of 1780 provided:

"Every subject has a right to be secure from all unreasonable searches, and seizures, of his person, his houses, his papers, and his possessions. All warrants, therefore, are contrary to this right, if the cause or founda-

at all to the limitations imposed by the Amendment if they are read to proscribe only certain conduct by the police but to allow other agents of the same government to take advantage of evidence secured by the police in violation of its requirements.[5] The Amendment therefore must be read to condemn not only the initial unconstitutional invasion of privacy—which is done, after all, for the purpose of securing evidence—but also the subsequent use of any evidence so obtained.

---

tion of them be not previously supported by oath or affirmation; and if the order in the warrant to a civil Officer, to make search in suspected places, or to arrest one or more suspected persons, or to seize their property, be not accompanied with a special designation of the persons or objects of search, arrest, or seizure: and no warrant ought to be issued, but in cases, and with the formalities prescribed by the laws." Art. XIV of the Declaration of Rights of 1780.

See generally T. Taylor, Two Studies in Constitutional Interpretation 41–43 (1969); N. Lasson, The History and Development of the Fourth Amendment to the United States Constitution 51–105 (1970); J. Lanynski, Search and Seizure and the Supreme Court: A Study in Constitutional Interpretation 30–48 (1966); Stewart, The Road to *Mapp v. Ohio* and Beyond: The Origins, Development, and Future of the Exclusionary Rule in Search-and-Seizure Cases, 83 Colum. L. Rev. 1365, 1369 (1983).

[5] In *Silverthorne Lumber Co. v. United States*, 251 U. S. 385 (1920), the Court expressly recognized this point in rejecting the Government's contention that it should be permitted to make use of knowledge obtained in violation of the Fourth Amendment:

"The Government now while in form repudiating and condemning the illegal seizure, seeks to maintain its right to avail itself of the knowledge obtained by that means which otherwise it would not have had.

"The proposition could not be presented more nakedly. It is that although of course its seizure was an outrage which the Government now regrets, it may study the papers before it returns them, copy them, and then may use the knowledge that it has gained to call upon the owners in a more regular form to produce them . . . . In our opinion such is not the law. It reduces the Fourth Amendment to a form of words. *The essence of a provision forbidding the acquisition of evidence in a certain way is that not merely evidence so acquired shall not be used before the Court but that it shall not be used at all." Id.,* at 391–392 (citations omitted) (emphasis added).

The Court evades this principle by drawing an artificial line between the constitutional rights and responsibilities that are engaged by actions of the police and those that are engaged when a defendant appears before the courts. According to the Court, the substantive protections of the Fourth Amendment are wholly exhausted at the moment when police unlawfully invade an individual's privacy and thus no substantive force remains to those protections at the time of trial when the government seeks to use evidence obtained by the police.

I submit that such a crabbed reading of the Fourth Amendment casts aside the teaching of those Justices who first formulated the exclusionary rule, and rests ultimately on an impoverished understanding of judicial responsibility in our constitutional scheme. For my part, "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures" comprises a personal right to exclude all evidence secured by means of unreasonable searches and seizures. The right to be free from the initial invasion of privacy and the right of exclusion are coordinate components of the central embracing right to be free from unreasonable searches and seizures.

Such a conception of the rights secured by the Fourth Amendment was unquestionably the original basis of what has come to be called the exclusionary rule when it was first formulated in *Weeks* v. *United States*, 232 U. S. 383 (1914). There the Court considered whether evidence seized in violation of the Fourth Amendment by a United States Marshal could be admitted at trial after the defendant had moved that the evidence be returned. Significantly, although the Court considered the Marshal's initial invasion of the defendant's home to be unlawful, it went on to consider a question that "involves the right of the court in a criminal prosecution to retain for the purposes of evidence the letters and correspondence of the accused, seized in his house in his absence without his authority, by a United States Marshal holding no

936

warrant for . . . the search of his premises." *Id.*, at 393. In answering that question, Justice Day, speaking for a unanimous Court, expressly recognized that the commands of the Fourth Amendment were addressed to both the courts and the Executive Branch:

> "The effect of the Fourth Amendment is to put the courts of the United States and Federal officials, in the exercise of their power and authority, under limitations and restraints as to the exercise of such power and authority, and to forever secure the people, their persons, houses, papers and effects against all unreasonable searches and seizures under the guise of law. This protection reaches all alike, whether accused of crime or not, and *the duty of giving to it force and effect is obligatory upon all entrusted under our Federal system with the enforcement of the laws.* The tendency of those who execute the criminal laws of the country to obtain conviction by means of unlawful seizures . . . should find no sanction in the judgments of the courts which are charged at all times with the support of the Constitution and to which people of all conditions have a right to appeal for the maintenance of such fundamental rights." *Id.*, at 391–392.

The heart of the *Weeks* opinion, and for me the beginning of wisdom about the Fourth Amendment's proper meaning, is found in the following passage:

> "If letters and private documents can . . . be seized and held and used in evidence against a citizen accused of an offense, the protection of the Fourth Amendment declaring his right to be secure against such searches and seizures is of no value, and, so far as those thus placed are concerned, might as well be stricken from the Constitution. The efforts of the courts and [federal] officials to bring the guilty to punishment, praiseworthy as they are, are not to be aided by the sacrifice of those great

principles established by years of endeavor and suffering which have resulted in their embodiment in the fundamental law of the land. The United States Marshal could only have invaded the house of the accused when armed with a warrant issued as required by the Constitution. . . . Instead, he acted without sanction of law, doubtless prompted by the desire to bring further proof to the aid of the Government, and under color of his office undertook to make a seizure of private papers in direct violation of the constitutional prohibition against such action. . . . To sanction such proceedings would be to affirm by judicial decision a manifest neglect if not an open defiance of the prohibitions of the Constitution, intended for the protection of the people against such unauthorized action." *Id.*, at 393–394.

What this passage succinctly captures is the essential recognition, ignored by the present Court, that seizures are generally executed for the purpose of bringing "proof to the aid of the Government," *id.*, at 393, that the utility of such evidence in a criminal prosecution arises ultimately in the context of the courts, and that the courts therefore cannot be absolved of responsibility for the means by which evidence is obtained. As the Court in *Weeks* clearly recognized, the obligations cast upon government by the Fourth Amendment are not confined merely to the police. In the words of Justice Holmes: "If the search and seizure are unlawful as invading personal rights secured by the Constitution those rights would be infringed yet further if the evidence were allowed to be used." *Dodge* v. *United States*, 272 U. S. 530, 532 (1926). As the Court further explained in *Olmstead* v. *United States*, 277 U. S. 438 (1928):

"The striking outcome of the *Weeks* case and those which followed it was the sweeping declaration that the Fourth Amendment, although not referring to or limiting the use of evidence in courts, really forbade its introduction if obtained by government officers through a

violation of the Amendment.   Theretofore many had
supposed under the ordinary common law rules, if the
tendered evidence was pertinent, the method of obtain-
ing it was unimportant. . . . But in the *Weeks* case, and
those which followed, this Court decided with great em-
phasis, and established as the law for the federal courts,
that the protection of the Fourth Amendment would
be much impaired unless it was held that not only was
the official violator of the rights under the Amendment
subject to an action at the suit of the injured defendant,
but also that the evidence thereby obtained could not be
received." *Id.*, at 462–463.

That conception of the rule, in my view, is more faithful to
the meaning and purpose of the Fourth Amendment and to
the judiciary's role as the guardian of the people's constitu-
tional liberties.   In contrast to the present Court's restric-
tive reading, the Court in *Weeks* recognized that, if the
Amendment is to have any meaning, police and the courts
cannot be regarded as constitutional strangers to each other;
because the evidence-gathering role of the police is directly
linked to the evidence-admitting function of the courts, an
individual's Fourth Amendment rights may be undermined
as completely by one as by the other.

## B

From the foregoing, it is clear why the question whether
the exclusion of evidence would deter future police miscon-
duct was never considered a relevant concern in the early
cases from *Weeks* to *Olmstead.*[6]   In those formative deci-
sions, the Court plainly understood that the exclusion of ille-
gally obtained evidence was compelled not by judicially fash-

---

[6] See generally Kamisar, Does (Did) (Should) The Exclusionary Rule
Rest on a "Principled Basis" Rather than an "Empirical Proposition"?,
16 Creighton L. Rev. 565, 598–599 (1983); Mertens & Wasserstrom, The
Good Faith Exception to the Exclusionary Rule: Deregulating the Police
and Derailing the Law, 70 Geo. L. J. 365, 379–380 (1981).

ioned remedial purposes, but rather by a direct constitutional command.  A new phase in the history of the rule, however, opened with the Court's decision in *Wolf* v. *Colorado*, 338 U. S. 25 (1949).  Although that decision held that the security of one's person and privacy protected by the Fourth Amendment was "implicit in 'the concept of ordered liberty' and as such enforceable against the States through the Due Process Clause" of the Fourteenth Amendment, *id.*, at 27–28, quoting *Palko* v. *Connecticut*, 302 U. S. 319, 325 (1937), the Court went on, in what can only be regarded as a *tour de force* of constitutional obfuscation, to say that the "ways of enforcing such a basic right raise questions of a different order," 338 U. S., at 28.  Notwithstanding the force of the *Weeks* doctrine that the Fourth Amendment required exclusion, a state court was free to admit illegally seized evidence, according to the Court in *Wolf*, so long as the State had devised some other "effective" means of vindicating a defendant's Fourth Amendment rights.  338 U. S., at 31.

Twelve years later, in *Mapp* v. *Ohio*, 367 U. S. 643 (1961), however, the Court restored the original understanding of the *Weeks* case by overruling the holding of *Wolf* and repudiating its rationale.  Although in the course of reaching this conclusion the Court in *Mapp* responded at certain points to the question, first raised in *Wolf*, of whether the exclusionary rule was an "effective" remedy compared to alternative means of enforcing the right, see 367 U. S., at 651–653, it nevertheless expressly held that "all evidence obtained by searches and seizures in violation of the Constitution is, *by that same authority*, inadmissible in a state court." *Id.*, at 655 (emphasis added).  In the Court's view, the exclusionary rule was not one among a range of options to be selected at the discretion of judges; it was "an essential part of both the Fourth and Fourteenth Amendments." *Id.*, at 657.  Rejection of the *Wolf* approach was constitutionally required, the Court explained, because "the admission of the new constitutional right by *Wolf* could not consistently tolerate denial of

its most important constitutional privilege, namely, the exclusion of the evidence which an accused had been forced to give by reason of the unlawful seizure. To hold otherwise is to grant the right but in reality to withhold its privilege and enjoyment." 367 U. S., at 656. Indeed, no other explanation suffices to account for the Court's holding in *Mapp*, since the only possible predicate for the Court's conclusion that the States were bound by the Fourteenth Amendment to honor the *Weeks* doctrine is that the exclusionary rule was "part and parcel of the Fourth Amendment's limitation upon [governmental] encroachment of individual privacy." 367 U. S., at 651.[7]

Despite this clear pronouncement, however, the Court since *Calandra* has gradually pressed the deterrence rationale for the rule back to center stage. See, *e. g., United States* v. *Peltier*, 422 U. S. 531 (1975); *United States* v. *Janis*, 428 U. S. 433 (1976); *Stone* v. *Powell*, 428 U. S. 465 (1976). The various arguments advanced by the Court in this campaign have only strengthened my conviction that the deterrence theory is both misguided and unworkable. First,

---

[7] Indeed, the Court in *Mapp* expressly noted that the "factual considerations" raised in *Wolf* concerning the effectiveness of alternative remedies "are not basically relevant to a decision that the exclusionary rule is an essential ingredient of the Fourth Amendment." 367 U. S., at 651. It is true that in *Linkletter* v. *Walker*, 381 U. S. 618 (1965), in holding that *Mapp* was not to be applied retroactively, the Court described the exclusionary rule as the "only effective deterrent to lawless police action," 381 U. S., at 636, thereby suggesting that the rule rested on a deterrence rationale. But, as I have explained on another occasion, "[t]he emphasis upon deterrence in *Linkletter* must be understood in the light of the crucial fact that the States had justifiably relied from 1949 to 1961 upon *Wolf* . . . , and consequently, that application of *Mapp* would have required the wholesale release of innumerable convicted prisoners, few of whom could have been successfully retried. In that circumstance, *Linkletter* held not only that retrospective application of *Mapp* would not further the goal of deterrence but also that it would not further 'the administration of justice and the integrity of the judicial process.' 381 U. S., at 637." *United States* v. *Calandra*, 414 U. S. 338, 359–360 (1974) (dissenting opinion).

the Court has frequently bewailed the "cost" of excluding reliable evidence. In large part, this criticism rests upon a refusal to acknowledge the function of the Fourth Amendment itself. If nothing else, the Amendment plainly operates to disable the government from gathering information and securing evidence in certain ways. In practical terms, of course, this restriction of official power means that some incriminating evidence inevitably will go undetected if the government obeys these constitutional restraints. It is the loss of that evidence that is the "price" our society pays for enjoying the freedom and privacy safeguarded by the Fourth Amendment. Thus, some criminals will go free *not*, in Justice (then Judge) Cardozo's misleading epigram, "because the constable has blundered," *People* v. *Defore*, 242 N. Y. 13, 21, 150 N. E. 585, 587 (1926), but rather because official compliance with Fourth Amendment requirements makes it more difficult to catch criminals. Understood in this way, the Amendment directly contemplates that some reliable and incriminating evidence will be lost to the government; therefore, it is not the exclusionary rule, but the Amendment itself that has imposed this cost.[8]

---

[8] Justice Stewart has explained this point in detail in a recent article:

"Much of the criticism leveled at the exclusionary rule is misdirected; it is more properly directed at the Fourth Amendment itself. It is true that, as many observers have charged, the effect of the rule is to deprive the courts of extremely relevant, often direct evidence of the guilt of the defendant. But these same critics fail to acknowledge that, in many instances, the same extremely relevant evidence would not have been obtained had the police officer complied with the commands of the fourth amendment in the first place. . . .

". . . The exclusionary rule places no limitations on the actions of the police. The fourth amendment does. The inevitable result of the Constitution's prohibition against unreasonable searches and seizures and its requirement that no warrant shall issue but upon probable cause is that police officers who obey its strictures will catch fewer criminals. . . . [T]hat is the price the framers anticipated and were willing to pay to ensure the sanctity of the person, the home, and property against

In addition, the Court's decisions over the past decade have made plain that the entire enterprise of attempting to assess the benefits and costs of the exclusionary rule in various contexts is a virtually impossible task for the judiciary to perform honestly or accurately. Although the Court's language in those cases suggests that some specific empirical basis may support its analyses, the reality is that the Court's opinions represent inherently unstable compounds of intuition, hunches, and occasional pieces of partial and often inconclusive data. In *Calandra*, for example, the Court, in considering whether the exclusionary rule should apply in grand jury proceedings, had before it no concrete evidence whatever concerning the impact that application of the rule in such proceedings would have either in terms of the long-term costs or the expected benefits. To the extent empirical data are available regarding the general costs and benefits of the exclusionary rule, such data have shown, on the one hand, as the Court acknowledges today, that the costs are not as substantial as critics have asserted in the past, see *ante*, at 907–908, n. 6, and, on the other hand, that while the exclusionary rule may well have certain deterrent effects, it is extremely difficult to determine with any degree of precision whether the incidence of unlawful conduct by police is now lower than it was prior to *Mapp*. See *United States* v. *Janis*, 428 U. S., at 449–453, and n. 22; *Stone* v. *Powell*, 428 U. S., at 492, n. 32.[9] The

unrestrained governmental power." Stewart, 83 Colum. L. Rev., at 1392–1393.

See also Dellinger, Of Rights and Remedies: The Constitution as a Sword, 85 Harv. L. Rev. 1532, 1563 (1972) ("Under the exclusionary rule a court attempts to maintain the status quo that would have prevailed if the constitutional requirement had been obeyed").

[9] See generally on this point, Davies, A Hard Look at What We Know (and Still Need to Learn) About the "Costs" of the Exclusionary Rule: The NIJ Study and Other Studies of "Lost" Arrests, 1983 A. B. F. Res. J. 611, 627–629; Canon, Ideology and Reality in the Debate over the Exclusionary Rule: A Conservative Argument for its Retention, 23 S. Tex. L. J. 559, 561–563 (1982); Critique, On the Limitations of Empirical Evaluations of

Court has sought to turn this uncertainty to its advantage by casting the burden of proof upon proponents of the rule, see, *e. g.*, *United States* v. *Janis, supra,* at 453–454. "Obviously," however, "the assignment of the burden of proof on an issue where evidence does not exist and cannot be obtained is outcome determinative. [The] assignment of the burden is merely a way of announcing a predetermined conclusion." [10]

By remaining within its redoubt of empiricism and by basing the rule solely on the deterrence rationale, the Court has robbed the rule of legitimacy. A doctrine that is explained as if it were an empirical proposition but for which there is only limited empirical support is both inherently unstable and an easy mark for critics. The extent of this Court's fidelity to Fourth Amendment requirements, however, should not turn on such statistical uncertainties. I share the view, expressed by Justice Stewart for the Court in *Faretta* v. *California,* 422 U. S. 806 (1975), that "[p]ersonal liberties are not rooted in the law of averages." *Id.,* at 834. Rather than seeking to give effect to the liberties secured by the Fourth Amendment through guesswork about deterrence, the Court should restore to its proper place the principle framed 70 years ago in *Weeks* that an individual whose privacy has been invaded in violation of the Fourth Amendment has a right grounded in that Amendment to prevent the government from subsequently making use of any evidence so obtained.

the Exclusionary Rule: A Critique of the Spiotto Research and United States v. Calandra, 69 Nw. U. L. Rev. 740 (1974).

[10] Dworkin, Fact Style Adjudication and the Fourth Amendment: The Limits of Lawyering, 48 Ind. L. J. 329, 332–333 (1973). See also White, Forgotten Points in the "Exclusionary Rule" Debate, 81 Mich. L. Rev. 1273, 1281–1282 (1983) (balancing of deterrent benefits and costs is an "inquiry [that] can never be performed in an adequate way and the reality is thus that the decision must rest not upon those grounds, but upon prior dispositions or unarticulated intuitions that are never justified"); Canon, *supra,* at 564; Kamisar, 16 Creighton L. Rev., at 646.

## II

Application of that principle clearly requires affirmance in the two cases decided today. In the first, *United States* v. *Leon*, No. 82–1771, it is conceded by the Government and accepted by the Court that the affidavit filed by the police officers in support of their application for a search warrant failed to provide a sufficient basis on which a neutral and detached magistrate could conclude that there was probable cause to issue the warrant. Specifically, it is conceded that the officers' application for a warrant was based in part on information supplied by a confidential informant of unproven reliability that was over five months old by the time it was relayed to the police. Although the police conducted an independent investigation on the basis of this tip, both the District Court and the Court of Appeals concluded that the additional information gathered by the officers failed to corroborate the details of the informant's tip and was "as consistent with innocence as . . . with guilt." App. to Pet. for Cert. 10a. The warrant, therefore, should never have issued. Stripped of the authority of the warrant, the conduct of these officers was plainly unconstitutional—it amounted to nothing less than a naked invasion of the privacy of respondents' homes without the requisite justification demanded by the Fourth Amendment. In order to restore the Government to the position it would have occupied had this unconstitutional search not occurred, therefore, it was necessary that the evidence be suppressed. As we said in *Coolidge* v. *New Hampshire*, 403 U. S. 443 (1971), the Warrant Clause is not "an inconvenience to be somehow 'weighed' against the claims of police efficiency. It is, or should be, an important working part of our machinery of government, operating as a matter of course to check the 'well-intentioned but mistakenly overzealous executive officers' who are part of any system of law enforcement." *Id.*, at 481 (footnote omitted).

A close examination of the facts of this case reveals that this is neither an extraordinary nor indeed a very costly step.

The warrant had authorized a search for cocaine, methaqualone tablets, and miscellaneous narcotics paraphernalia at several locations: a condominium at 7902 Via Magdalena in Los Angeles; a residence at 620 Price Drive in Burbank; a residence at 716 South Sunset Canyon in Burbank; and four automobiles owned respectively by respondents Leon, Sanchez, Stewart, and Del Castillo. App. 31–33. Pursuant to this warrant, the officers seized approximately four pounds of cocaine and over 1,000 methaqualone tablets from the Via Magdalena condominium, nearly one pound of cocaine from the Sunset Canyon residence, about an ounce of cocaine from the Price Drive residence, and certain paraphernalia from Del Castillo's and Stewart's automobiles. On the basis of this and other evidence, the four respondents were charged with violating 21 U. S. C. § 846 for conspiring to possess and distribute cocaine, and § 841(a)(1) for possessing methaqualone and cocaine with intent to distribute. The indictment specifically alleged that respondents had maintained the Via Magdalena condominum as a storage area for controlled substances which they distributed to prospective purchasers. App. 27–28.

At the suppression hearing, the District Court determined that none of the respondents had a sufficient expectation of privacy to contest the search of the Via Magdalena condominium, that respondents Stewart and Sanchez could challenge the search of their home at Price Drive, that respondent Leon was entitled to challenge the search of his home at Sunset Canyon, and that respondents Del Castillo and Stewart could contest the search of their cars. Given its finding that probable cause to issue the warrant was lacking, the District Court ruled that the evidence from the Price Drive residence could not be used against respondents Stewart and Sanchez, that evidence from the Sunset Canyon residence could not be used against Leon, and that evidence obtained from both Del Castillo's and Stewart's automobiles could not be used against them. App. to Pet. for Cert. 10a–13a.

The tenor of the Court's opinion suggests that this order somehow imposed a grave and presumably unjustifiable cost on society. Such a suggestion, however, is a gross exaggeration. Since the indictment focused upon a conspiracy among all respondents to use the Via Magdalena condominium as a storage area for controlled substances, and since the bulk of the evidence seized was from that condominium and was plainly admissible under the District Court's order, the Government would clearly still be able to present a strong case to the jury following the court's suppression order. I emphasize these details not to suggest how the Government's case would fare before the jury but rather to clarify a point that is lost in the Court's rhetorical excesses over the costs of the exclusionary rule—namely, that the suppression of evidence will certainly tend to weaken the Government's position but it will rarely force the Government to abandon a prosecution. Cf. *infra*, at 950–951, and n. 11. In my view, a doctrine that preserves intact the constitutional rights of the accused, and, at the same time, is sufficiently limited to permit society's legitimate and pressing interest in criminal law enforcement to be served should not be so recklessly discarded. It is a doctrine that gives life to the "very heart of the Fourth Amendment directive: that . . . a governmental search and seizure should represent both the efforts of the officer to gather evidence of wrongful acts and the judgment of the magistrate that the collected evidence is sufficient to justify invasion of a citizen's private premises." *United States* v. *United States District Court*, 407 U. S. 297, 316 (1972).

In the second case before the Court, *Massachusetts* v. *Sheppard*, No. 82–963, the State concedes and the Court accepts that the warrant issued to search respondent's home completely failed to state with particularity the things to be seized. Indeed, the warrant expressly and particularly described things such as "controlled substance[s]" and "other paraphernalia used in, for, or in connection with the unlawful possession or use of any controlled substance" that the police had no reason whatsoever to believe were to be found in

respondent's home.   App. 17a.   Given the Fourth Amendment's requirement that "no Warrants shall issue, but upon probable cause . . . and particularly describing the . . . things to be seized," this warrant should never have been issued. The police who entered respondent's home, therefore, were without constitutional authority to do so.

Although the Court's opinion tends to overlook this fact, the requirement of particularity is not a mere "technicality," it is an express constitutional command.   *Ybarra* v. *Illinois*, 444 U. S. 85, 92 (1979); *Lo-Ji Sales, Inc.* v. *New York*, 442 U. S. 319 (1979); *Stanford* v. *Texas*, 379 U. S. 476 (1965); *Marron* v. *United States*, 275 U. S. 192, 196 (1927).   The purpose of that requirement is to prevent precisely the kind of governmental conduct that the faulty warrant at issue here created a grave risk of permitting—namely, a search that was not narrowly and particularly limited to the things that a neutral and detached magistrate had reason to believe might be found at respondent's home.   Although it is true, as JUSTICE STEVENS observes, see *post*, at 964, that the affidavit submitted by the police set forth with particularity those items that they sought authority to search for, it is nevertheless clear that the warrant itself—the document which actually gave the officers legal authority to invade respondent's privacy—made no mention of these items.   And, although it is true that the particular officers who applied for the warrant also happened to execute it and did so in accordance with the limits proposed in their affidavit, this happenstance should have no bearing on the central question whether these officers secured that prior judicial authority to conduct their search required by the Fourth Amendment.   As we made clear in *United States* v. *United States District Court, supra,* at 317 (footnote omitted), "[t]he Fourth Amendment contemplates a prior judicial judgment, not the risk that executive discretion may be reasonably exercised."   See also *Katz* v. *United States*, 389 U. S. 347, 356–357 (1967) ("this Court has never sustained a search upon the sole ground that officers reasonably expected to find evidence of a particular crime

and voluntarily confined their activities to the least intrusive means consistent with that end"). Had the warrant actually been enforced by officers other than those who prepared the affidavit, the same result might not have occured; indeed, the wholly erroneous nature of the warrant might have led such officers to feel at liberty to roam throughout respondent's home in search of drugs. Cf. *Whiteley* v. *Warden*, 401 U. S. 560 (1971). I therefore fail to see how a search pursuant to such a fundamentally defective warrant can be characterized as "reasonable."

What the Framers of the Bill of Rights sought to accomplish through the express requirements of the Fourth Amendment was to define precisely the conditions under which government agents could search private property so that citizens would not have to depend solely upon the discretion and restraint of those agents for the protection of their privacy. Although the self-restraint and care exhibited by the officers in this case is commendable, that alone can never be a sufficient protection for constitutional liberties. I am convinced that it is not too much to ask that an attentive magistrate take those minimum steps necessary to ensure that every warrant he issues describes with particularity the things that his independent review of the warrant application convinces him are likely to be found in the premises. And I am equally convinced that it is not too much to ask that well-trained and experienced police officers take a moment to check that the warrant they have been issued at least describes those things for which they have sought leave to search. These convictions spring not from my own view of sound criminal law enforcement policy, but are instead compelled by the language of the Fourth Amendment and the history that led to its adoption.

III

Even if I were to accept the Court's general approach to the exclusionary rule, I could not agree with today's result.

There is no question that in the hands of the present Court the deterrence rationale has proved to be a powerful tool for confining the scope of the rule. In *Calandra*, for example, the Court concluded that the "speculative and undoubtedly minimal advance in the deterrence of police misconduct," was insufficient to outweigh the "expense of substantially impeding the role of the grand jury." 414 U. S., at 351–352. In *Stone* v. *Powell*, the Court found that "the additional contribution, if any, of the consideration of search-and-seizure claims of state prisoners on collateral review is small in relation to the costs." 428 U. S., at 493. In *United States* v. *Janis*, 428 U. S. 433 (1976), the Court concluded that "exclusion from federal civil proceedings of evidence unlawfully seized by a state criminal enforcement officer has not been shown to have a sufficient likelihood of deterring the conduct of the state police so that it outweighs the societal costs imposed by the exclusion." *Id.*, at 454. And in an opinion handed down today, the Court finds that the "balance between costs and benefits comes out against applying the exclusionary rule in civil deportation hearings held by the [Immigration and Naturalization Service]." *INS* v. *Lopez-Mendoza, post,* at 1050.

Thus, in this bit of judicial stagecraft, while the sets sometimes change, the actors always have the same lines. Given this well-rehearsed pattern, one might have predicted with some assurance how the present case would unfold. First there is the ritual incantation of the "substantial social costs" exacted by the exclusionary rule, followed by the virtually foreordained conclusion that, given the marginal benefits, application of the rule in the circumstances of these cases is not warranted. Upon analysis, however, such a result cannot be justified even on the Court's own terms.

At the outset, the Court suggests that society has been asked to pay a high price—in terms either of setting guilty persons free or of impeding the proper functioning of trials—as a result of excluding relevant physical evidence in cases

where the police, in conducting searches and seizing evidence, have made only an "objectively reasonable" mistake concerning the constitutionality of their actions. See *ante*, at 907–908. But what evidence is there to support such a claim?

Significantly, the Court points to none, and, indeed, as the Court acknowledges, see *ante*, at 907–908, n. 6, recent studies have demonstrated that the "costs" of the exclusionary rule—calculated in terms of dropped prosecutions and lost convictions—are quite low. Contrary to the claims of the rule's critics that exclusion leads to "the release of countless guilty criminals," *Bivens* v. *Six Unknown Federal Narcotics Agents*, 403 U. S. 388, 416 (1971) (BURGER, C. J., dissenting), these studies have demonstrated that federal and state prosecutors very rarely drop cases because of potential search and seizure problems. For example, a 1979 study prepared at the request of Congress by the General Accounting Office reported that only 0.4% of all cases actually declined for prosecution by federal prosecutors were declined primarily because of illegal search problems. Report of the Comptroller General of the United States, Impact of the Exclusionary Rule on Federal Criminal Prosecutions 14 (1979). If the GAO data are restated as a percentage of *all* arrests, the study shows that only 0.2% of all felony arrests are declined for prosecution because of potential exclusionary rule problems. See Davies, A Hard Look at What We Know (and Still Need to Learn) About the "Costs" of the Exclusionary Rule: The NIJ Study and Other Studies of "Lost" Arrests, 1983 A. B. F. Res. J. 611, 635.[11] Of course, these data de-

---

[11] In a series of recent studies, researchers have attempted to quantify the actual costs of the rule. A recent National Institute of Justice study based on data for the 4-year period 1976–1979 gathered by the California Bureau of Criminal Statistics showed that 4.8% of all cases that were declined for prosecution by California prosecutors were rejected because of illegally seized evidence. National Institute of Justice, Criminal Justice Research Report—The Effects of the Exclusionary Rule: A Study in Cali-

scribe only the costs attributable to the exclusion of evidence in all cases; the costs due to the exclusion of evidence in the narrower category of cases where police have made objectively reasonable mistakes must necessarily be even smaller. The Court, however, ignores this distinction and mistakenly weighs the aggregated costs of exclusion in *all* cases, irrespective of the circumstances that led to exclusion, see *ante*, at 907, against the potential benefits associated with only those cases in which evidence is excluded because police reasonably but mistakenly believe that their conduct does not violate the Fourth Amendment, see *ante*, at 915–921. When such faulty scales are used, it is little wonder that the balance tips in favor of restricting the application of the rule.

---

fornia 1 (1982). However, if these data are calculated as a percentage of all arrests, they show that only 0.8% of all arrests were rejected for prosecution because of illegally seized evidence. See Davies, 1983 A. B. F. Res. J., at 619.

In another measure of the rule's impact—the number of prosecutions that are dismissed or result in acquittals in cases where evidence has been excluded—the available data again show that the Court's past assessment of the rule's costs has generally been exaggerated. For example, a study based on data from nine midsized counties in Illinois, Michigan, and Pennsylvania reveals that motions to suppress physical evidence were filed in approximately 5% of the 7,500 cases studied, but that such motions were successful in only 0.7% of all these cases. Nardulli, The Societal Cost of the Exclusionary Rule: An Empirical Assessment, 1983 A. B. F. Res. J. 585, 596. The study also shows that only 0.6% of all cases resulted in acquittals because evidence had been excluded. *Id.*, at 600. In the GAO study, suppression motions were filed in 10.5% of all federal criminal cases surveyed, but of the motions filed, approximately 80–90% were denied. GAO Report, at 8, 10. Evidence was actually excluded in only 1.3% of the cases studied, and only 0.7% of all cases resulted in acquittals or dismissals after evidence was excluded. *Id.*, at 9–11. See Davies, *supra*, at 660. And in another study based on data from cases during 1978 and 1979 in San Diego and Jacksonville, it was shown that only 1% of all cases resulting in nonconviction were caused by illegal searches. F. Feeney, F. Dill, & A. Weir, Arrests Without Conviction: How Often They Occur and Why (National Institute of Justice 1983). See generally Davies, *supra*, at 663.

What then supports the Court's insistence that this evidence be admitted?   Apparently, the Court's only answer is that even though the costs of exclusion are not very substantial, the potential deterrent effect in these circumstances is so marginal that exclusion cannot be justified.   The key to the Court's conclusion in this respect is its belief that the prospective deterrent effect of the exclusionary rule operates only in those situations in which police officers, when deciding whether to go forward with some particular search, have reason to know that their planned conduct will violate the requirements of the Fourth Amendment.   See *ante*, at 919–921. If these officers in fact understand (or reasonably should understand because the law is well settled) that their proposed conduct will offend the Fourth Amendment and that, consequently, any evidence they seize will be suppressed in court, they will refrain from conducting the planned search.   In those circumstances, the incentive system created by the exclusionary rule will have the hoped-for deterrent effect. But in situations where police officers reasonably (but mistakenly) believe that their planned conduct satisfies Fourth Amendment requirements—presumably either (a) because they are acting on the basis of an apparently valid warrant, or (b) because their conduct is only later determined to be invalid as a result of a subsequent change in the law or the resolution of an unsettled question of law—then such officers will have no reason to refrain from conducting the search and the exclusionary rule will have no effect.

At first blush, there is some logic to this position.   Undoubtedly, in the situation hypothesized by the Court, the existence of the exclusionary rule cannot be expected to have any deterrent effect on the particular officers at the moment they are deciding whether to go forward with the search. Indeed, the subsequent exclusion of any evidence seized under such circumstances appears somehow "unfair" to the particular officers involved.   As the Court suggests, these officers have acted in what they thought was an appropriate

and constitutionally authorized manner, but then the fruit of their efforts is nullified by the application of the exclusionary rule. *Ante,* at 920–921.

The flaw in the Court's argument, however, is that its logic captures only one comparatively minor element of the generally acknowledged deterrent purposes of the exclusionary rule. To be sure, the rule operates to some extent to deter future misconduct by individual officers who have had evidence suppressed in their own cases. But what the Court overlooks is that the deterrence rationale for the rule is not designed to be, nor should it be thought of as, a form of "punishment" of individual police officers for their failures to obey the restraints imposed by the Fourth Amendment. See *United States* v. *Peltier,* 422 U. S., at 556–557 (BRENNAN, J., dissenting). Instead, the chief deterrent function of the rule is its tendency to promote institutional compliance with Fourth Amendment requirements on the part of law enforcement agencies generally.[12] Thus, as the Court has previ-

---

[12] As Justice Stewart has observed:

"[T]he exclusionary rule is not designed to serve a specific deterrence function; that is, it is not designed to punish the particular police officer for violating a person's fourth amendment rights. Instead, the rule is designed to produce a 'systematic deterrence': the exclusionary rule is intended to create an incentive for law enforcement officials to establish procedures by which police officers are trained to comply with the fourth amendment because the purpose of the criminal justice system—bringing criminals to justice—can be achieved only when evidence of guilt may be used against defendants." Stewart, 83 Colum. L. Rev., at 1400.

See also Oaks, Studying the Exclusionary Rule in Search and Seizure, 37 U. Chi. L. Rev. 665, 709–710 (1970) ("The exclusionary rule is not aimed at special deterrence since it does not impose any direct punishment on a law enforcement official who has broken the rule. . . . The exclusionary rule is aimed at affecting the wider audience of all law enforcement officials and society at large. It is meant to discourage violations by individuals who have never experienced any sanction for them"); Mertens & Wasserstrom, 70 Geo. L. J., at 399–401; Kamisar, 16 Creighton L. Rev., at 597, n. 204.

ously recognized, "over the long term, [the] demonstration [provided by the exclusionary rule] that our society attaches serious consequences to violation of constitutional rights is thought to encourage those who formulate law enforcement policies, and the officers who implement them, to incorporate Fourth Amendment ideals into their value system." *Stone* v. *Powell*, 428 U. S., at 492. It is only through such an institutionwide mechanism that information concerning Fourth Amendment standards can be effectively communicated to rank-and-file officers.[13]

---

[13] Although specific empirical data on the systemic deterrent effect of the rule are not conclusive, the testimony of those actually involved in law enforcement suggests that, at the very least, the *Mapp* decision had the effect of increasing police awareness of Fourth Amendment requirements and of prompting prosecutors and police commanders to work towards educating rank-and-file officers. For example, as former New York Police Commissioner Murphy explained the impact of the *Mapp* decision: "I can think of no decision in recent times in the field of law enforcement which had such a dramatic and traumatic effect . . . . I was immediately caught up in the entire program of reevaluating our procedures, which had followed the *Defore* rule, and modifying, amending, and creating new policies and new instructions for the implementation of *Mapp*. . . . Retraining sessions had to be held from the very top administrators down to each of the thousands of foot patrolmen." Murphy, Judicial Review of Police Methods in Law Enforcement: The Problem of Compliance by Police Departments, 44 Texas L. Rev. 939, 941 (1966).

Further testimony about the impact of the *Mapp* decision can be found in the statement of Deputy Commissioner Reisman: "The *Mapp* case was a shock to us. We had to reorganize our thinking, frankly. Before this, nobody bothered to take out search warrants. Although the U. S. Constitution requires warrants in most cases, the U. S. Supreme Court had ruled that evidence obtained without a warrant—illegally, if you will—was admissible in state courts. So the feeling was, why bother? Well, once that rule was changed we knew we had better start teaching our men about it." N. Y. Times, Apr. 28, 1965, p. 50, col. 1. A former United States Attorney and now Attorney General of Maryland, Stephen Sachs, has described the impact of the rule on police practices in similar terms: "I have watched the rule deter, routinely, throughout my years as a prosecutor. . . . [P]olice-prosecutor consultation is customary in all our cases when Fourth Amendment concerns arise. . . . In at least three Maryland

If the overall educational effect of the exclusionary rule is considered, application of the rule to even those situations in which individual police officers have acted on the basis of a reasonable but mistaken belief that their conduct was authorized can still be expected to have a considerable long-term deterrent effect. If evidence is consistently excluded in these circumstances, police departments will surely be prompted to instruct their officers to devote greater care and attention to providing sufficient information to establish probable cause when applying for a warrant, and to review with some attention the form of the warrant that they have been issued, rather than automatically assuming that whatever document the magistrate has signed will necessarily comport with Fourth Amendment requirements.

After today's decisions, however, that institutional incentive will be lost. Indeed, the Court's "reasonable mistake" exception to the exclusionary rule will tend to put a premium on police ignorance of the law. Armed with the assurance provided by today's decisions that evidence will always be admissible whenever an officer has "reasonably" relied upon a warrant, police departments will be encouraged to train officers that if a warrant has simply been signed, it is reasonable, without more, to rely on it. Since in close cases there will no longer be any incentive to err on the side of constitutional behavior, police would have every reason to adopt a "let's-wait-until-it's-decided" approach in situations in which there is a question about a warrant's validity or the basis for its issuance. Cf. *United States* v. *Johnson*, 457 U. S. 537, 561 (1982).[14]

---

jurisdictions, for example, prosecutors are on twenty-four hour call to field search and seizure questions presented by police officers." Sachs, The Exclusionary Rule: A Prosecutor's Defense, 1 Crim. Justice Ethics 28, 30 (Summer/Fall 1982). See also LaFave, The Fourth Amendment in an Imperfect World: On Drawing "Bright Lines" and "Good Faith," 43 U. Pitt. L. Rev. 307, 319 (1982); Mertens & Wasserstrom, *supra*, at 394–401.

[14] The authors of a recent study of the warrant process in seven cities concluded that application of a good-faith exception where an officer relies

Although the Court brushes these concerns aside, a host of grave consequences can be expected to result from its decision to carve this new exception out of the exclusionary rule. A chief consequence of today's decisions will be to convey a clear and unambiguous message to magistrates that their decisions to issue warrants are now insulated from subsequent judicial review. Creation of this new exception for good-faith reliance upon a warrant implicitly tells magistrates that they need not take much care in reviewing warrant applications, since their mistakes will from now on have virtually no consequence: If their decision to issue a warrant was correct, the evidence will be admitted; if their decision was incorrect but the police relied in good faith on the warrant, the evidence will also be admitted. Inevitably, the care and attention devoted to such an inconsequential chore will dwindle. Although the Court is correct to note that magistrates do not share the same stake in the outcome of a criminal case as the police, they nevertheless need to appreciate that their role is of some moment in order to continue performing the important task of carefully reviewing warrant applications. Today's decisions effectively remove that incentive.[15]

---

upon a warrant "would further encourage police officers to seek out the less inquisitive magistrates and to rely on boilerplate formulae, thereby lessening the value of search warrants overall. Consequently, the benefits of adoption of a broad good faith exception in terms of a few additional prosecutions appears to be outweighed by the harm to the quality of the entire search warrant process and the criminal justice system in general." R. Van Duizend, L. Sutton, & C. Carter, The Search Warrant Process: Preconceptions, Perceptions, and Practices 8–12 (Review Draft, National Center for State Courts, 1983). See also Stewart, 83 Colum. L. Rev., at 1403.

[15] Just last Term in *Illinois* v. *Gates*, 462 U. S. 213 (1983), the Court noted:

"Sufficient information must be presented to the magistrate to allow that official to determine probable cause; his action cannot be a mere ratification of the bare conclusions of others. In order to ensure that such an abdication of the magistrate's duty does not occur, courts must continue to

Moreover, the good-faith exception will encourage police to provide only the bare minimum of information in future warrant applications. The police will now know that if they can secure a warrant, so long as the circumstances of its issuance are not "entirely unreasonable," *ante*, at 923, all police conduct pursuant to that warrant will be protected from further judicial review.[16] The clear incentive that operated in the past to establish probable cause adequately because reviewing courts would examine the magistrate's judgment carefully, see, *e. g.*, *Franks* v. *Delaware*, 438 U. S. 154, 169–170 (1978); *Jones* v. *United States*, 362 U. S. 257, 271–272 (1960); *Giordenello* v. *United States*, 357 U. S. 480, 483 (1958), has now been so completely vitiated that the police need only show that it was not "entirely unreasonable" under the cir-

conscientiously review the sufficiency of affidavits on which warrants are issued." *Id.*, at 239.

After today's decisions, there will be little reason for reviewing courts to conduct such a conscientious review; rather, these courts will be more likely to focus simply on the question of police good faith. Despite the Court's confident prediction that such review will continue to be conducted, see *ante*, at 924–925, it is difficult to believe that busy courts faced with heavy dockets will take the time to render essentially advisory opinions concerning the constitutionality of the magistrate's decision before considering the officer's good faith.

[16] As the Court of Appeals for the Second Circuit has observed in this regard:

"If a magistrate's issuance of a warrant were to be, as the government would have it, an all but conclusive determination of the validity of the search and of the admissibility of the evidence seized thereby, police officers might have a substantial incentive to submit their warrant applications to the least demanding magistrates, since once the warrant was issued, it would be exceedingly difficult later to exclude any evidence seized in the resulting search even if the warrant was issued without probable cause. . . . For practical purposes, therefore, the standard of probable cause might be diluted to that required by the least demanding official authorized to issue warrants, even if this fell well below what the Fourth Amendment required." *United States* v. *Karathanos*, 531 F. 2d 26, 34 (1976).

cumstances of a particular case for them to believe that the warrant they were issued was valid. See *ante*, at 923. The long-run effect unquestionably will be to undermine the integrity of the warrant process.

Finally, even if one were to believe, as the Court apparently does, that police are hobbled by inflexible and hypertechnical warrant procedures, today's decisions cannot be justified. This is because, given the relaxed standard for assessing probable cause established just last Term in *Illinois* v. *Gates*, 462 U. S. 213 (1983), the Court's newly fashioned good-faith exception, when applied in the warrant context, will rarely, if ever, offer any greater flexibility for police than the *Gates* standard already supplies. In *Gates*, the Court held that "[t]he task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Id.*, at 238. The task of a reviewing court is confined to determining whether "the magistrate had a 'substantial basis for . . . conclud[ing]' that probable cause existed." *Ibid.* Given such a relaxed standard, it is virtually inconceivable that a reviewing court, when faced with a defendant's motion to suppress, could first find that a warrant was invalid under the new *Gates* standard, but then, at the same time, find that a police officer's reliance on such an invalid warrant was nevertheless "objectively reasonable" under the test announced today.[17] Because the two standards overlap so completely, it is unlikely that a warrant could be found invalid under *Gates* and yet the police reliance upon it could be seen as objectively reasonable; otherwise, we would have to entertain the mind-

---

[17] See Kamisar, *Gates*, "Probable Cause," "Good Faith," and Beyond, 69 Iowa L. Rev. 551, 588–589 (1984); Wasserstrom, The Incredible Shrinking Fourth Amendment, 21 Am. Crim. L. Rev. 257 (1984); LaFave, 43 U. Pitt. L. Rev., at 307.

boggling concept of objectively reasonable reliance upon an objectively unreasonable warrant.

This paradox, as JUSTICE STEVENS suggests, see *post*, at 961–962, perhaps explains the Court's unwillingness to remand No. 82–1771 for reconsideration in light of *Gates*, for it is quite likely that on remand the Court of Appeals would find no violation of the Fourth Amendment, thereby demonstrating that the supposed need for the good-faith exception in this context is more apparent than real. Therefore, although the Court's decisions are clearly limited to the situation in which police officers reasonably rely upon an apparently valid warrant in conducting a search, I am not at all confident that the exception unleashed today will remain so confined. Indeed, the full impact of the Court's regrettable decisions will not be felt until the Court attempts to extend this rule to situations in which the police have conducted a warrantless search solely on the basis of their own judgment about the existence of probable cause and exigent circumstances. When that question is finally posed, I for one will not be surprised if my colleagues decide once again that we simply cannot afford to protect Fourth Amendment rights.

## IV

When the public, as it quite properly has done in the past as well as in the present, demands that those in government increase their efforts to combat crime, it is all too easy for those government officials to seek expedient solutions. In contrast to such costly and difficult measures as building more prisons, improving law enforcement methods, or hiring more prosecutors and judges to relieve the overburdened court systems in the country's metropolitan areas, the relaxation of Fourth Amendment standards seems a tempting, costless means of meeting the public's demand for better law enforcement. In the long run, however, we as a society pay a heavy price for such expediency, because as Justice Jackson observed, the rights guaranteed in the Fourth Amendment

"are not mere second-class rights but belong in the catalog of indispensable freedoms." *Brinegar* v. *United States,* 338 U. S. 160, 180 (1949) (dissenting opinion). Once lost, such rights are difficult to recover. There is hope, however, that in time this or some later Court will restore these precious freedoms to their rightful place as a primary protection for our citizens against overreaching officialdom.

I dissent.

JUSTICE STEVENS, concurring in the judgment in No. 82–963, *post,* p. 981, and dissenting in No. 82–1771.

It is appropriate to begin with the plain language of the Fourth Amendment:

> "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated; and no Warrants shall issue but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

The Court assumes that the searches in these cases violated the Fourth Amendment, yet refuses to apply the exclusionary rule because the Court concludes that it was "reasonable" for the police to conduct them. In my opinion an official search and seizure cannot be both "unreasonable" and "reasonable" at the same time. The doctrinal vice in the Court's holding is its failure to consider the separate purposes of the two prohibitory Clauses in the Fourth Amendment.

The first Clause prohibits unreasonable searches and seizures and the second prohibits the issuance of warrants that are not supported by probable cause or that do not particularly describe the place to be searched and the persons or things to be seized. We have, of course, repeatedly held that warrantless searches are presumptively unreasonable,[1]

---

[1] See, *e. g., Payton* v. *New York,* 445 U. S. 573, 586 (1980); *Chimel* v. *California,* 395 U. S. 752, 762–763 (1969).

and that there are only a few carefully delineated exceptions to that basic presumption.[2]   But when such an exception has been recognized, analytically we have necessarily concluded that the warrantless activity was not "unreasonable" within the meaning of the first Clause.   Thus, any Fourth Amendment case may present two separate questions: whether the search was conducted pursuant to a warrant issued in accordance with the second Clause, and, if not, whether it was nevertheless "reasonable" within the meaning of the first. On these questions, the constitutional text requires that we speak with one voice.   We cannot intelligibly assume, *arguendo*, that a search was constitutionally unreasonable but that the seized evidence is admissible because the same search was reasonable.

I

In No. 82–963, the Supreme Judicial Court of Massachusetts determined that a warrant which purported to authorize a search of respondent's home had been issued in violation of the Warrant Clause.   In its haste to make new law, this Court does not tarry to consider this holding.   Yet, as I will demonstrate, this holding is clearly wrong; I would reverse the judgment on that ground alone.

In No. 82–1771, there is also a substantial question whether the warrant complied with the Fourth Amendment. There was a strong dissent on the probable-cause issue when *Leon* was before the Court of Appeals, and that dissent has been given added force by this Court's intervening decision in *Illinois* v. *Gates*, 462 U. S. 213 (1983), which constituted a significant development in the law.   It is probable, though admittedly not certain, that the Court of Appeals would now conclude that the warrant in *Leon* satisfied the Fourth Amendment if it were given the opportunity to reconsider the issue in the light of *Gates*.   Adherence to our normal

---

[2] See, *e. g.*, *Coolidge* v. *New Hampshire*, 403 U. S. 443, 474–475 (1971); *Vale* v. *Louisiana*, 399 U. S. 30 (1970).

practice following the announcement of a new rule would therefore postpone, and probably obviate, the need for the promulgation of the broad new rule the Court announces today.[3]

It is, of course, disturbing that the Court chooses one case in which there was no violation of the Fourth Amendment, and another in which there is grave doubt on the question, in order to promulgate a "good faith" exception to the Fourth Amendment's exclusionary rule.   The Court's explanation for its failure to decide the merits of the Fourth Amendment question in No. 82–963 is that it "is a factbound issue of little importance," *Massachusetts* v. *Sheppard*, *post*, at 988, n. 5. In No. 82–1771, the Court acknowledges that the case could be remanded to the Court of Appeals for reconsideration in light of *Gates*, yet does not bother to explain why it fails to do so except to note that it is "within our power" to decide the broader question in the case.   *United States* v. *Leon*, *ante*, at 905.   The Court seems determined to decide these cases on the broadest possible grounds; such determination is utterly at odds with the Court's traditional practice as well as any principled notion of judicial restraint.   Decisions made in this manner are unlikely to withstand the test of time.

Judges, more than most, should understand the value of adherence to settled procedures.   By adopting a set of fair procedures, and then adhering to them, courts of law ensure that justice is administered with an even hand.   "These are subtle matters, for they concern the ingredients of what constitutes justice.   Therefore, justice must satisfy the appearance of justice."   *Offutt* v. *United States*, 348 U. S. 11, 14 (1954).   Of course, this Court has a duty to face questions of constitutional law when necessary to the disposition of an actual case or controversy.   *Marbury* v. *Madison*, 1 Cranch

---

[3] In his petition for certiorari in *Leon*, the Solicitor General did not seek plenary review, but only that the petition "be disposed of as appropriate in light of the Court's decision in *Illinois* v. *Gates*," Pet. for Cert. in *United States* v. *Leon*, No. 82–1771, p. 10.

137, 177 (1803). But when the Court goes beyond what is necessary to decide the case before it, it can only encourage the perception that it is pursuing its own notions of wise social policy, rather than adhering to its judicial role. I do not believe the Court should reach out to decide what is undoubtedly a profound question concerning the administration of criminal justice before assuring itself that this question is actually and of necessity presented by the concrete facts before the Court. Although it may appear that the Court's broad holding will serve the public interest in enforcing obedience to the rule of law, for my part, I remain firmly convinced that "the preservation of order in our communities will be best ensured by adherence to established and respected procedures." *Groppi* v. *Leslie*, 436 F. 2d 331, 336 (CA7 1971) (en banc) (Stevens, J., dissenting), rev'd, 404 U. S. 496 (1972).

## II

In No. 82–963, there is no contention that the police officers did not receive appropriate judicial authorization for their search of respondent's residence. A neutral and detached judicial officer had correctly determined that there was probable cause to conduct a search. Nevertheless, the Supreme Judicial Court suppressed the fruits of the search because the warrant did not particularly describe the place to be searched and the things to be seized.

The particularity requirement of the Fourth Amendment has a manifest purpose—to prevent general searches. By limiting the authorization to search to the specific areas and things for which there is probable cause to search, the requirement ensures that the search is carefully tailored to its justification, and does not resemble the wide-ranging general searches that the Framers intended to prohibit.[4] In this

---

[4] See *Andresen* v. *Maryland*, 427 U. S. 463, 480 (1976); *Stanley* v. *Georgia*, 394 U. S. 557, 569–572 (1969) (Stewart, J., concurring in result); *Stanford* v. *Texas*, 379 U. S. 476, 481–482, 485 (1965); *Go-Bart Importing Co.* v. *United States*, 282 U. S. 344, 357 (1931); *Marron* v. *United States*, 275 U. S. 192, 195–196 (1927).

case the warrant did not come close to authorizing a general search.[5]

The affidavit supporting the application for the warrant correctly identified the things to be seized, and on its face the affidavit indicated that it had been presented to the judge who had issued the warrant.[6] Both the police officers and the judge were fully aware of the contents of the affidavit, and therefore knew precisely what the officers were authorized to search for. Since the affidavit was available for after-the-fact review, the Massachusetts courts could readily ascertain the limits of the officers' authority under the warrant. In short, the judge who issued the warrant, the police officers who executed it, and the reviewing courts all were able easily to ascertain the precise scope of the authorization provided by the warrant.

All that our cases require is that a warrant contain a description sufficient to enable the officers who execute it to ascertain with reasonable effort where they are to search and what they are to seize.[7] The test is whether the executing officers' discretion has been limited in a way that forbids a general search.[8] Here there was no question that the

---

[5] Indeed, the "defect" in the warrant was that it authorized—albeit mistakenly—a search for quite particular "things to be seized," controlled substances, rather than the evidence described in the affidavit supporting the warrant application. This "defect" posed no risk of a general search. On its face, the warrant correctly identified the place to be searched. Thus, the threshold invasion of privacy—entry into respondent's home—was properly and specifically authorized. Moreover, the four corners of the warrant plainly indicate that it was not intended to authorize a search for controlled substances. On the cover of the warrant the caption "Controlled Substances" had been crossed out, and an "addendum" to the warrant authorized a search for and seizure of a rifle and ammunition, indicating that the warrant was not limited to controlled substances.

[6] The issuing judge attested to the affiant's signature on the affidavit.

[7] See Steele v. United States, 267 U. S. 498, 503 (1925).

[8] See Lo-Ji Sales, Inc. v. New York, 442 U. S. 319, 325 (1979); Andresen v. Maryland, 427 U. S., at 480–482; Marcus v. Search Warrant, 367 U. S. 717, 732–733 (1961).

executing officers' discretion had been limited—they, as well as the reviewing courts, knew the precise limits of their authorization. There was simply no "occasion or opportunity for officers to rummage at large," *Zurcher* v. *Stanford Daily*, 436 U. S. 547, 566 (1978).[9]

The only Fourth Amendment interest that is arguably implicated by the "defect" in the warrant is the citizen's interest in being able to ascertain the limits of the officers' authorization by examining the warrant.[10] Respondent, however, was not home at the time the warrant was executed, and therefore had no occasion to see the warrant. The two persons who were present when the warrant was executed, respondent's mother and sister, did not read the warrant or ask to have it read. "[T]he general rule [is] that Fourth Amendment rights are personal rights which, like some other constitutional rights, may not be vicariously asserted." *Alderman* v. *United States*, 394 U. S. 165, 174 (1969). Thus, respondent, who has standing to assert only his own Fourth Amendment interests,[11] cannot complain that his interest in ascertaining the limits of the officers' authority under the search warrant was infringed.[12] In short, our

---

[9] See also *Coolidge* v. *New Hampshire*, 403 U. S., at 467.

[10] See *Illinois* v. *Gates*, 462 U. S. 213, 236 (1983); *United States* v. *Chadwick*, 433 U. S. 1, 9 (1977); *Camara* v. *Municipal Court*, 387 U. S. 523, 532 (1967).

[11] See, *e. g.*, *Rawlings* v. *Kentucky*, 448 U. S. 98, 104–106 (1980); *Rakas* v. *Illinois*, 439 U. S. 128 (1978).

[12] Even if respondent had standing to assert his right to be able to ascertain the officers' authority from the four corners of the warrant, it is doubtful that he could succeed. On its face the warrant authorized a search of respondent's residence, "42 Deckard Street." Had respondent read the warrant he would have had no reason to question the officers' right to enter the premises. Moreover, the face of the warrant indicated that the caption "Controlled Substances" had been stricken, and at the bottom of the warrant an addendum authorized the search for and seizure of a rifle and ammunition. The supporting affidavit, which the police had with them when they executed the warrant, and which was attested by the same judge who had issued the warrant, described in detail the items which the police were authorized to search for and to seize.

precedents construing the particularity requirement of the Warrant Clause unambiguously demonstrate that this warrant did not violate the Fourth Amendment.

## III

Even if it be assumed that there was a technical violation of the particularity requirement in No. 82–963, it by no means follows that the "warrantless" search in that case was "unreasonable" within the meaning of the Fourth Amendment. For this search posed none of the dangers to which the Fourth Amendment is addressed. It was justified by a neutral magistrate's determination of probable cause and created no risk of a general search. It was eminently "reasonable."

In No. 82–1771, however, the Government now admits—at least for the tactical purpose of achieving what it regards as a greater benefit—that the substance, as well as the letter, of the Fourth Amendment was violated. The Court therefore assumes that the warrant in that case was not supported by probable cause, but refuses to suppress the evidence obtained thereby because it considers the police conduct to satisfy a "newfangled" nonconstitutional standard of reasonableness.[13] Yet if the Court's assumption is correct—if there was no probable cause—it must follow that it was "unreasonable"

---

[13] I borrow the adjective from Justice Clark, who so characterized the warrants authorized by the Court in *Camara* v. *Municipal Court*, 387 U. S. 523 (1967), but not authorized by the Constitution itself. In an opinion joined by Justice Harlan and Justice Stewart, he wrote:

"Today the Court renders this municipal experience, which dates back to Colonial days, for naught by overruling *Frank* v. *Maryland* [359 U. S. 360 (1959)] and by striking down hundreds of city ordinances throughout the country and jeopardizing thereby the health, welfare, and safety of literally millions of people.

"But this is not all. It prostitutes the command of the Fourth Amendment that 'no Warrants shall issue, but upon probable cause' and sets up in the health and safety codes area inspection a newfangled 'warrant' system that is entirely foreign to Fourth Amendment standards. It is regrettable that the Court wipes out such a long and widely accepted practice and

for the authorities to make unheralded entries into and searches of private dwellings and automobiles. The Court's conclusion that such searches undertaken without probable cause can nevertheless be "reasonable" is totally without support in our Fourth Amendment jurisprudence.

Just last Term, the Court explained what probable cause to issue a warrant means:

"The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and the 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois* v. *Gates*, 462 U. S., at 238.

Moreover, in evaluating the existence of probable cause, reviewing courts must give substantial deference to the magistrate's determination.[14]   In doubtful cases the warrant

creates in its place such enormous confusion in all of our towns and metropolitan cities in one fell swoop." *See* v. *City of Seattle*, 387 U. S. 541, 547 (1967) (dissenting in both *Camara* and *See*).

The kind of doctrinal difficulties in the two lines of cases engendered by the Court's creation of a newfangled warrant, compare *Marshall* v. *Barlow's, Inc.*, 436 U. S. 307 (1978), with *Donovan* v. *Dewey*, 452 U. S. 594 (1981), can be expected to grow out of the Court's creation of a new double standard of reasonableness today.   Ironically, as I have previously suggested, the failure to consider both Clauses of the Amendment infects both lines of decision.   See *Michigan* v. *Clifford*, 464 U. S. 287, 301–303 (1984) (STEVENS, J., concurring in judgment); *Dewey*, 452 U. S., at 606–608 (STEVENS, J., concurring); *Michigan* v. *Tyler*, 436 U. S. 499, 513 (1978) (STEVENS, J., concurring in part and concurring in judgment); *Barlow's*, 436 U. S., at 325–339 (STEVENS J., dissenting).

[14] See *Massachusetts* v. *Upton*, 466 U. S. 727, 732–733 (1984) *(per curiam); Illinois* v. *Gates*, 462 U. S., at 236; *United States* v. *Harris*, 403 U. S. 573, 577–583 (1971) (plurality opinion); *Spinelli* v. *United States*, 393 U. S. 410, 419 (1969); *Aguilar* v. *Texas*, 378 U. S. 108, 111 (1964); *Jones* v. *United States*, 362 U. S. 257, 271 (1960).

968

should be sustained.[15]  The judgment as to whether there is probable cause must be made in a practical and nontechnical manner.[16]  The probable-cause standard therefore gives law enforcement officers ample room to engage in any reasonable law enforcement activity.  What is more, the standard has been familiar to the law enforcement profession for centuries.[17]  In an opinion written in 1949, and endorsed by the Court last Term in *Gates*, we explained:

> "These long-prevailing standards seek to safeguard citizens from rash and unreasonable interferences with privacy and from unfounded charges of crime.  They also seek to give fair leeway for enforcing the law in the community's protection.  Because many situations which confront officers in the course of executing their duties are more or less ambiguous, room must be allowed for some mistakes on their part.  But the mistakes must be those of reasonable men, acting on facts leading sensibly to their conclusions of probability.  The rule of probable cause is a practical, nontechnical conception affording the best compromise that has been found for accommodating these often opposing interests.  Requiring more would unduly hamper law enforcement.  To allow less would be to leave law-abiding citizens at the mercy of the officers' whim or caprice." *Brinegar* v. *United States*, 338 U. S. 160, 176.

Thus, if the majority's assumption is correct, that even after paying heavy deference to the magistrate's finding and resolving all doubt in its favor, there is no probable cause here, then by definition—as a matter of constitutional law—

---

[15] See *Illinois* v. *Gates*, 462 U. S., at 237, n. 10; *United States* v. *Ventresca*, 380 U. S. 102, 109 (1965).

[16] See *Massachusetts* v. *Upton*, 466 U. S., at 732 *(per curiam)*; *Illinois* v. *Gates*, 462 U. S., at 231; *United States* v. *Ventresca*, 380 U. S., at 108.

[17] See, *e. g.*, 2 M. Hale, Pleas of the Crown 150 (1st Am. ed. 1847).

the officers' conduct was unreasonable.[18]   The Court's own hypothesis is that there was no fair likelihood that the officers would find evidence of a crime, and hence there was no reasonable law enforcement justification for their conduct.[19]

The majority's contrary conclusion rests on the notion that it must be reasonable for a police officer to rely on a magistrate's finding.   Until today that has plainly not been the law; it has been well settled that even when a magistrate issues a warrant there is no guarantee that the ensuing search and seizure is constitutionally reasonable.   Law enforcement officers have long been on notice that despite the magistrate's decision a warrant will be invalidated if the officers did not provide sufficient facts to enable the magistrate to evaluate the existence of probable cause responsibly and independently.[20]   Reviewing courts have always inquired into whether the magistrate acted properly in issuing the warrant—not merely whether the officers acted properly in executing it.   See *Jones* v. *United States*, 362 U. S. 257, 271–272 (1960).[21]   Indeed, just last Term, in *Gates*, after not-

---

[18] "[I]f nothing said under oath in the warrant application demonstrates the need for an unannounced search by force, the probable-cause requirement is not satisfied.   In the absence of some other showing of reasonableness, the ensuing search violates the Fourth Amendment." *Zurcher* v. *Stanford Daily*, 436 U. S. 547, 583 (1978) (STEVENS, J., dissenting).

[19] As the majority recognizes, *United States* v. *Leon*, *ante*, at 915, n. 13, an officer's good faith cannot make otherwise "unreasonable" conduct reasonable.   See *Terry* v. *Ohio*, 392 U. S. 1, 22 (1968); *Beck* v. *Ohio*, 379 U. S. 89, 97 (1964); *Henry* v. *United States*, 361 U. S. 98, 102 (1959). The majority's failure to appreciate the significance of that recognition is inexplicable.

[20] See *Franks* v. *Delaware*, 438 U. S. 154, 165, 169–170 (1978); *Whiteley* v. *Warden*, 401 U. S. 560, 564 (1971); *Spinelli* v. *United States*, 393 U. S., at 415–416; *United States* v. *Ventresca*, 380 U. S., at 108–109; *Aguilar* v. *Texas*, 378 U. S., at 113–115; *Nathanson* v. *United States*, 290 U. S. 41 (1933); *Byars* v. *United States*, 273 U. S. 28 (1927).

[21] In making this point in *Franks* v. *Delaware*, 438 U. S. 154 (1978), JUSTICE BLACKMUN wrote for the Court: "We see no principled basis for distinguishing between the question of the sufficiency of an affidavit, which

ing that "'the duty of a reviewing court is simply to ensure that the magistrate had a 'substantial basis for conclud[ing]' that probable cause existed,'" 462 U. S., at 238–239 (quoting *Jones*, 362 U. S., at 271), the Court added:

"Sufficient information must be presented to the magistrate to allow that official to determine probable cause; his action cannot be a mere ratification of the bare conclusions of others. In order to ensure that such an abdication of the magistrate's duty does not occur, courts must continue to conscientiously review the sufficiency of affidavits on which warrants are issued." 462 U. S. at 239.[22]

Thus, under our cases it has never been "reasonable" for the police to rely on the mere fact that a warrant has issued; the police have always known that if they fail to supply the magistrate with sufficient information, the warrant will be held invalid and its fruits excluded.[23]

The notion that a police officer's reliance on a magistrate's warrant is automatically appropriate is one the Framers of

is also subject to a post-search examination, and the question of its integrity." *Id.*, at 171. Yet today the Court justifies its holding in part by distinguishing veracity claims, *United States* v. *Leon*, *ante*, at 922–923, thereby distinguishing what we previously held could not be distinguished on a principled basis. Just why it should be less reasonable for an innocent officer to rely on a warrant obtained by another officer's fraud than for him to rely on a warrant that is not supported by probable cause is entirely unclear to me.

[22] Judicial review of magisterial determinations is all the more necessary since the magistrate acts without benefit of adversarial presentation; his determination partakes of the unreliability inherent in any *ex parte* proceeding. See *Franks* v. *Delaware*, 438 U. S., at 169.

[23] The majority seems to be captivated by a vision of courts invalidating perfectly reasonable police conduct because of "technical" violations of the Fourth Amendment. In my view there is no such thing as a "technical" violation of the Fourth Amendment. No search or seizure can be unconstitutional unless it is "unreasonable." By definition a Fourth Amendment violation cannot be reasonable. My analysis of No. 82–963 illustrates this point.

the Fourth Amendment would have vehemently rejected. The precise problem that the Amendment was intended to address was *the unreasonable issuance of warrants*. As we have often observed, the Amendment was actually motivated by the practice of issuing general warrants—warrants which did not satisfy the particularity and probable-cause requirements.[24] The resentments which led to the Amendment were directed at the issuance of *warrants* unjustified by particularized evidence of wrongdoing.[25] Those who sought to amend the Constitution to include a Bill of Rights repeatedly voiced the view that the evil which had to be addressed was the issuance of warrants on insufficient evidence.[26] As Professor Taylor has written:

---

[24] See, *e. g.*, *Steagald* v. *United States*, 451 U. S. 204, 220 (1981); *Payton* v. *New York*, 445 U. S., at 583–584; *Lo-Ji Sales, Inc.* v. *New York*, 442 U. S., at 325; *Marshall* v. *Barlow's, Inc.*, 436 U. S., at 327–328 (STEVENS, J., dissenting); *United States* v. *Chadwick*, 433 U. S., at 7–8; *Chimel* v. *California*, 395 U. S., at 760–762; *Stanford* v. *Texas*, 379 U. S., at 480–485; *Marcus* v. *Search Warrant*, 367 U. S., at 727–729; *Henry* v. *United States*, 361 U. S., at 100–101; *Frank* v. *Maryland*, 359 U. S. 360, 363–365 (1959); *United States* v. *Rabinowitz*, 339 U. S. 56, 69–70 (1950) (Frankfurter, J., dissenting); *Marron* v. *United States*, 275 U. S., at 195–196; *Weeks* v. *United States*, 232 U. S. 383, 390–391 (1914); *Boyd* v. *United States*, 116 U. S. 616, 624–630 (1886).

[25] See J. Landynski, Search and Seizure and the Supreme Court 19–47 (1966); N. Lasson, The History and Development of the Fourth Amendment to the United States Constitution 53–98 (1937); R. Rutland, The Birth of the Bill of Rights 11 (rev. ed. 1983); Marke, The Writs of Assistance Case and the Fourth Amendment, in Essays in Legal History in Honor of Felix Frankfurter 351 (M. Forkosch ed. 1966).

[26] See 1 The Bill of Rights: A Documentary History 473, 488–489, 508 (B. Schwartz ed. 1971); 2 *id.*, at 658, 665, 730, 733–734, 805–806, 815, 841–842, 913, 968. In fact, the original version of the Fourth Amendment contained only one clause providing that the right to be protected against unreasonable searches and seizures "shall not be violated by warrants issuing . . . ." The change to its present form broadened the coverage of the Amendment but did not qualify the unequivocal prohibition against the issuance of warrants without probable cause. See 2 *id.*, at 1112; N. Lasson, *supra* n. 25, at 101–103.

> "[O]ur constitutional fathers were not concerned about warrantless searches, but about overreaching warrants. It is perhaps too much to say that they feared the warrant more than the search, but it is plain enough that the warrant was the prime object of their concern. Far from looking at the warrant as a protection against unreasonable searches, they saw it as an authority for unreasonable and oppressive searches . . . ." T. Taylor, Two Studies in Constitutional Interpretation 41 (1969).

In short, the Framers of the Fourth Amendment were deeply suspicious of warrants; in their minds the paradigm of an abusive search was the execution of a warrant not based on probable cause. The fact that colonial officers had magisterial authorization for their conduct when they engaged in general searches surely did not make their conduct "reasonable." The Court's view that it is consistent with our Constitution to adopt a rule that it is presumptively reasonable to rely on a defective warrant is the product of constitutional amnesia.[27]

## IV

In *Brinegar*, Justice Jackson, after observing that "[i]ndications are not wanting that Fourth Amendment freedoms are tacitly marked as secondary rights, to be relegated to a deferred position," 338 U. S., at 180 (dissenting opinion), continued:

> "These, I protest, are not mere second-class rights but belong in the catalog of indispensable freedoms. Among deprivations of rights, none is so effective in cowing a population, crushing the spirit of the individual and putting terror in every heart. Uncontrolled search and

---

[27] "It makes all the difference in the world whether one recognizes the central fact about the Fourth Amendment, namely, that it was a safeguard against recurrence of abuses so deeply felt by the Colonies as to be one of the potent causes of the Revolution, or one thinks of it as merely a requirement for a piece of paper." *United States* v. *Rabinowitz*, 339 U. S., at 69 (Frankfurter, J., dissenting).

seizure is one of the first and most effective weapons in the arsenal of every arbitrary government. And one need only briefly to have dwelt and worked among a people possessed of many admirable qualities but deprived of these rights to know that the human personality deteriorates and dignity and self-reliance disappear where homes, persons and possessions are subject at any hour to unheralded search and seizure by the police.

.        .        .        .        .

"Only occasional and more flagrant abuses come to the attention of the courts, and then only those where the search and seizure yields incriminating evidence and the defendant is at least sufficiently compromised to be indicted. If the officers raid a home, an office, or stop and search an automobile but find nothing incriminating, this invasion of the personal liberty of the innocent too often finds no practical redress. There may be, and I am convinced that there are, many unlawful searches of homes and automobiles of innocent people which turn up nothing incriminating, in which no arrest is made, about which courts do nothing, and about which we never hear.

"Courts can protect the innocent against such invasions only indirectly and through the medium of excluding evidence obtained against those who frequently are guilty. . . . So a search against Brinegar's car must be regarded as a search of the car of Everyman." *Id.*, at 180–181.

Justice Jackson's reference to his experience at Nuremberg should remind us of the importance of considering the consequences of today's decision for "Everyman."

The exclusionary rule is designed to prevent violations of the Fourth Amendment.[28] "Its purpose is to deter—to com-

_____

[28] For at least two reasons, the exclusionary rule is a better remedy than a civil action against an offending officer. Unlike the fear of personal liability, it should not create excessive deterrence; moreover, it avoids the obvious unfairness of subjecting the dedicated officer to the risk of mone-

pel respect for the constitutional guaranty in the only effectively available way, by removing the incentive to disregard it." *Elkins* v. *United States*, 364 U. S. 206, 217 (1960).[29] If the police cannot use evidence obtained through warrants issued on less than probable cause, they have less incentive to seek those warrants, and magistrates have less incentive to issue them.

Today's decisions do grave damage to that deterrent function. Under the majority's new rule, even when the police know their warrant application is probably insufficient, they retain an incentive to submit it to a magistrate, on the chance that he may take the bait. No longer must they hesitate and seek additional evidence in doubtful cases. Thus, what we

---

tary liability for a misstep while endeavoring to enforce the law. Society, rather than the individual officer, should accept the responsibility for inadequate training or supervision of officers engaged in hazardous police work. What THE CHIEF JUSTICE wrote, some two decades ago, remains true today:

"It is the proud claim of a democratic society that the people are masters and all officials of the state are servants of the people. That being so, the ancient rule of *respondeat superior* furnishes us with a simple, direct and reasonable basis for refusing to admit evidence secured in violation of constitutional or statutory provisions. Since the policeman is society's servant, his acts in the execution of his duty are attributable to the master or employer. Society as a whole is thus responsible and society is 'penalized' by refusing it the benefit of evidence secured by the illegal action. This satisfies me more than the other explanations because it seems to me that society—in a country like ours—*is* involved in and *is* responsible for what is done in its name and by its agents. Unlike the Germans of the 1930's and early '40's, we cannot say 'it is all The Leader's doing. I am not responsible.' In a representative democracy we are responsible, whether we like it or not. And so each of us is involved and each is in this sense responsible when a police officer breaks rules of law established for our common protection." Burger, Who Will Watch the Watchman?, 14 Am. U. L. Rev. 1, 14 (1964) (emphasis in original) (footnote omitted).

[29] See *Stone* v. *Powell*, 428 U. S. 465, 484 (1976); *United States* v. *Janis*, 428 U. S. 433, 443, n. 12 (1976); *United States* v. *Calandra*, 414 U. S. 338, 347–348 (1974); *Terry* v. *Ohio*, 392 U. S., at 29; *Tehan* v. *United States ex rel. Shott*, 382 U. S. 406, 413 (1966); *Mapp* v. *Ohio*, 367 U. S. 643, 656 (1961).

said two Terms ago about a rule that would prevent exclusion except in cases in which the authorities violate well-settled law applies fully to the rule the Court adopts today:

> "If, as the Government argues, all rulings resolving unsettled Fourth Amendment questions should be non-retroactive, then, in close cases law enforcement officials would have little incentive to err on the side of constitutional behavior. Official awareness of the dubious constitutionality of a practice would be counterbalanced by official certainty that, so long as the Fourth Amendment law in the area remained unsettled, evidence obtained through the questionable practice would be excluded only in the one case definitively resolving the unsettled question. Failure to accord *any* retroactive effect to Fourth Amendment rulings would 'encourage police or other courts to disregard the plain purport of our decisions and to adopt a let's-wait-until-it's-decided approach.'" *United States* v. *Johnson*, 457 U. S. 537, 561 (1982) (emphasis in original) (footnote omitted) (quoting *Desist* v. *United States*, 394 U. S. 244, 277 (1969) (Fortas, J., dissenting)).[30]

The Court is of course correct that the exclusionary rule cannot deter when the authorities have no reason to know that their conduct is unconstitutional. But when probable cause is lacking, then by definition a reasonable person under the circumstances would not believe there is a fair likelihood that a search will produce evidence of a crime. Under such circumstances well-trained professionals must know that they are violating the Constitution. The Court's approach—

---

[30] See also LaFave, The Fourth Amendment in an Imperfect World: On Drawing "Bright Lines" and "Good Faith," 43 U. Pitt. L. Rev. 307, 358 (1982); Stewart, The Road to *Mapp v. Ohio* and Beyond: The Origins, Development and Future of the Exclusionary Rule in Search-and-Seizure Cases, 83 Colum. L. Rev. 1365, 1401–1403 (1983); Wasserstrom, The Incredible Shrinking Fourth Amendment, 21 Am. Crim. L. Rev. 257, 395–397 (1984).

which, in effect, encourages the police to seek a warrant even if they know the existence of probable cause is doubtful—can only lead to an increased number of constitutional violations.

Thus, the Court's creation of a double standard of reasonableness inevitably must erode the deterrence rationale that still supports the exclusionary rule. But we should not ignore the way it tarnishes the role of the judiciary in enforcing the Constitution. For the original rationale for the exclusionary rule retains its force as well as its relevance:

> "The tendency of those who execute the criminal laws of the country to obtain conviction by means of unlawful seizures . . . should find no sanction in the judgments of the courts which are charged at all times with the support of the Constitution and to which people of all conditions have a right to appeal for the maintenance of such fundamental rights." *Weeks* v. *United States*, 232 U. S. 383, 392 (1914).[31]

Thus, "Courts which sit under our Constitution cannot and will not be made party to lawless invasions of the constitu-

---

[31] The Court continued:

"The efforts of the courts and their officials to bring the guilty to punishment, praiseworthy as they are, are not to be aided by the sacrifice of those great principles established by years of endeavor and suffering which have resulted in their embodiment in the fundamental law of the land. The United States Marshal could only have invaded the house of the accused when armed with a warrant issued as required by the Constitution, upon sworn information and describing with reasonable particularity the things for which the search was to be made. Instead, he acted without sanction of law, doubtless prompted by the desire to bring further proof to the aid of the Government, and under color of his office undertook to make a seizure of private papers in direct violation of the constitutional prohibition against such action. Under such circumstances, without sworn information and particular description, not even an order of court would have justified such procedure . . . . To sanction such proceedings would be to affirm by judicial decision a manifest neglect if not an open defiance of the prohibitions of the Constitution, intended for the protection of the people against such unauthorized action." 232 U. S., at 393–394.

tional rights of citizens by permitting unhindered governmental use of the fruits of such invasions. . . ." *Terry* v. *Ohio,* 392 U. S. 1, 13 (1968).[32]  As the Court correctly notes,[33] we have refused to apply the exclusionary rule to collateral contexts in which its marginal efficacy is questionable; until today, however, every time the police have violated the applicable commands of the Fourth Amendment a court has been prepared to vindicate that Amendment by preventing the use of evidence so obtained in the prosecution's case in chief against those whose rights have been violated.[34] Today, for the first time, this Court holds that although the Constitution has been violated, no court should do anything about it at any time and in any proceeding.[35]  In my judg-

---

[32] See *United States* v. *Peltier,* 422 U. S. 531, 536 (1975); *Lee* v. *Florida,* 392 U. S. 378, 385–386 (1968); *Berger* v. *New York,* 388 U. S. 41, 50 (1967); *Mapp* v. *Ohio,* 367 U. S., at 647–650; *Byars* v. *United States,* 273 U. S., at 33–34.

[33] *United States* v. *Leon, ante,* at 908–913.

[34] Indeed, we have concluded that judicial integrity is not compromised by the refusal to apply the exclusionary rule to collateral contexts precisely because the defendant is able to vindicate his rights in the primary context—his trial and direct appeal therefrom.  See *Stone* v. *Powell,* 428 U. S., at 485–486.

[35] As the majority recognizes, *United States* v. *Leon, ante,* at 922–923, and n. 23, in all cases in which its "good faith" exception to the exclusionary rule would operate, there will also be immunity from civil damages.  See also *United States* v. *Ross,* 456 U. S. 798, 823, n. 32 (1982); *Stadium Films, Inc.* v. *Baillargeon,* 542 F. 2d 577, 578 (CA1 1976); *Madison* v. *Manter,* 441 F. 2d 537 (CA1 1971).  See generally *Pierson* v. *Ray,* 386 U. S. 547 (1967).  The Court amazingly suggests that in some cases in which suppression would not be appropriate courts should nevertheless adjudicate the merits of Fourth Amendment claims to provide guidance to police and magistrates but not a remedy.  *United States* v. *Leon, ante,* at 925.  Not only is the propriety of deciding constitutional questions in the absence of the strict necessity to do so open to serious question, see *Bowen* v. *United States,* 422 U. S. 916, 920 (1975), but such a proceeding, in which a court would declare that the Constitution had been violated but that it was unwilling to do anything about it, seems almost a mockery: "[T]he assurance against unreasonable federal searches and seizures would be

ment, the Constitution requires more. Courts simply cannot escape their responsibility for redressing constitutional violations if they admit evidence obtained through unreasonable searches and seizures, since the entire point of police conduct that violates the Fourth Amendment is to obtain evidence for use at trial. If such evidence is admitted, then the courts become not merely the final and necessary link in an unconstitutional chain of events, but its actual motivating force. "If the existing code does not permit district attorneys to have a hand in such dirty business it does not permit the judge to allow such iniquities to succeed." *Olmstead* v. *United States*, 277 U. S. 438, 470 (1928) (Holmes, J., dissenting). Nor should we so easily concede the existence of a constitutional violation for which there is no remedy.[36] To do so is to convert a Bill of *Rights* into an unenforced honor code that the police may follow in their discretion. The Constitution requires more; it requires a *remedy*.[37] If the Court's new rule is to be followed, the Bill of Rights should be renamed.

---

'a form of words,' valueless and undeserving of mention in a perpetual charter of inestimable human liberties." *Mapp* v. *Ohio*, 367 U. S., at 655. See also *Segura* v. *United States*, ante, at 838–840 (STEVENS, J., dissenting).

[36] "The very essence of civil liberty certainly consists in the right of every individual to claim the protection of the laws, whenever he receives an injury." *Marbury* v. *Madison*, 1 Cranch 137, 163 (1803). See generally Schrock & Welsh, Up From Calandra: The Exclusionary Rule as a Constitutional Requirement, 59 Minn. L. Rev. 251, 350–372 (1974).

[37] See Stewart, 83 Colum. L. Rev., at 1383–1384 (footnotes omitted) ("In my opinion, however, the framers did not intend the Bill of Rights to be no more than unenforceable guiding principles—no more than a code of ethics under an honor system. The proscriptions and guarantees in the amendments were intended to create legal rights and duties"). See also Ervin, The Exclusionary Rule: An Essential Ingredient of the Fourth Amendment, 1983 S. Ct. Rev. 283. In fact, if the Constitution of the United States does not compel use of the exclusionary rule, *Mapp* v. *Ohio*, 367 U. S. 643 (1961), which the majority does not purport to question, could not have been decided as it was. See *id.*, at 655 ("We hold that all evidence obtained by searches and seizures in violation of the Constitution is, by that same authority, inadmissible in a state court").

It is of course true that the exclusionary rule exerts a high price—the loss of probative evidence of guilt. But that price is one courts have often been required to pay to serve important social goals.[38] That price is also one the Fourth Amendment requires us to pay, assuming as we must that the Framers intended that its strictures "shall not be violated." For in all such cases, as Justice Stewart has observed, "the same extremely relevant evidence would not have been obtained had the police officer complied with the commands of the fourth amendment in the first place."[39]

> "[T]he forefathers thought this was not too great a price to pay for that decent privacy of home, papers and effects which is indispensable to individual dignity and self-respect. They may have overvalued privacy, but I am not disposed to set their command at naught." *Harris* v. *United States*, 331 U. S. 145, 198 (1947) (Jackson, J., dissenting).[40]

We could, of course, facilitate the process of administering justice to those who violate the criminal laws by ignoring the commands of the Fourth Amendment—indeed, by ignoring

---

[38] The exclusion of probative evidence in order to serve some other policy is by no means unique to the Fourth Amendment. In his famous treatise on evidence, Dean Wigmore devoted an entire volume to such exclusionary rules, which are common in the law of evidence. See 8 J. Wigmore, Evidence (J. McNaughton rev. 1961) (discussing, *inter alia*, marital privilege, attorney-client privilege, communications among jurors, state secrets privilege, physician-patient privilege, priest-penitent privilege).

[39] Stewart, 83 Colum. L. Rev., at 1392 (footnote omitted). See also Traynor, Mapp v. Ohio at Large in the Fifty States, 1962 Duke L. J. 319, 322 ("Ah, but surely the guilty should not go free? However grave the question, it seemed improperly directed at the exclusionary rule. The hard answer is in the United States Constitution as well as in state constitutions. They make it clear that the guilty would go free if the evidence necessary to convict could only have been obtained illegally, just as they would go free if such evidence were lacking because the police had observed the constitutional restraints upon them").

[40] See also *United States* v. *Di Re*, 332 U. S. 581, 595 (1948).

the entire Bill of Rights—but it is the very purpose of a Bill of Rights to identify values that may not be sacrificed to expediency.  In a just society those who govern, as well as those who are governed, must obey the law.

While I concur in the Court's judgment in No. 82–963, I would vacate the judgment in No. 82–1771 and remand the case to the Court of Appeals for reconsideration in the light of *Gates*.  Accordingly, I respectfully dissent from the disposition in No. 82–1771.